757 N.W.2d 367 (2008)
276 Neb. 755
STATE of Nebraska, Appellee,
v.
Michael P. DAVIS, Appellant.
No. S-08-135.
Supreme Court of Nebraska.
November 21, 2008.
*370 Matthew R. Kahler, of Finley Law Offices, P.C., L.L.O., for appellant.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
In the evening hours of December 4, 1993, Michael P. Davis killed Michael Campbell with a .22-caliber revolver. Campbell was 16 years old and had never met Davis. Campbell had been arguing with a casual acquaintance of Davis when Davis fired a shot at Campbell and missed; then, after Campbell had turned away from Davis, Davis walked up to Campbell, placed the gun against the back of his head, and fired, killing him.
Following a bench trial, the court convicted Davis on one count of second degree murder and a related count of use of a weapon to commit a felony in connection with the murder. The court sentenced him to life imprisonment on the second degree murder conviction and 10 years' imprisonment on the weapon conviction. The court ordered the sentences to run consecutively. Davis argues several issues, but the principle issue is whether the State produced sufficient evidence to convict him of the second degree murder charge. We conclude that it did.

II. BACKGROUND

1. FACTS
The killing arose out of an altercation between two groups of young men ranging in age from 15 to 20 years. The first group included Joe Sandoval, Ignacio Palma, Jesse Serrano, and Davis. Before the day of the shooting, Davis had never met any of the individuals with whom he went to a shopping mall in Omaha, Nebraska. Nor had he met any members of the second group that included Campbell, Mario Castenada, Victorio Ramos, and Micah Preiksaitis.
The first group, including Davis, gathered at Palma's house before going to the mall. While there, Davis showed a Colt.22-caliber single-action revolver to Sandoval and Palma. Davis' brother, who was an acquaintance of Serrano and Palma, had given Davis the gun earlier in the day. Palma watched Davis load the gun, place it under his coat, and leave the house.
Palma's girlfriend drove the group to the mall some time during the late afternoon or early evening. When the group arrived at the mall, Davis said "he was glad he had a gun just in case anybody started trouble with him." Around this time, the second group was arriving at the mall. The second group entered the mall and went up the escalators to the arcade. While they were going up on the escalators, Davis and Sandoval were going down. *371 Davis and Sandoval both alleged that the second group was "throwing up gang signs and stuff like that, laughing at us and stuff."
Eventually both groups ended up in the arcade, where Campbell and Serrano got into a confrontation. The exact cause of the confrontation was unclear but apparently there had been previous run-ins between Serrano and Campbell. Both groups were in the arcade for about 2 minutes. Shortly afterward, both groups headed outside to the south entrance of the mall.
The groups stood to the east of the entrance to the mall, facing each other. Serrano and Campbell stood face-to-face, and continued exchanging words like: "`We can do this. You know, we can go ahead and fight, you know.'" Davis stood next to Serrano, but the record reflects that only Campbell and Serrano were arguing.
The fight escalated. The witnesses' testimonies vary slightly. Castenada, in Campbell's group, stated that Serrano was reaching into his waistband as if to pull a gun or knife. All the witnesses agree that Campbell then stated, "`What? You got a gun? Shoot me, shoot me,'" and then he threw his hands up. Davis then stated, "`I'll shoot him,'" pulled out his gun, and fired the first shot. The witnesses disagreed where Davis pointed the gun when he fired. Some witnesses stated it was pointed at Campbell's chest, and others stated Davis pointed it away from Campbell. The record reflects that the first shot did not hit Campbell and that the police never recovered the bullet.
After Davis fired the first shot, Campbell turned and started walking away from Serrano and Davis. According to witnesses, between 5 and 30 seconds elapsed before Davis walked up to Campbell, placed the gun against the back of his head, and fired a second shot.
Davis and his group then got into Palma's girlfriend's car and drove away. Palma testified that in the car, Davis said, "`I shot that Lomas'" and "`I'll do it again.'" In contrast, Sandoval's testimony is that Davis stated, "`I didn't mean to shoot him.'"
An autopsy determined that the cause of death was a direct-contact gunshot wound to the back of Campbell's head.

2. PROCEDURAL HISTORY
On April 21, 1994, the court heard evidence on Davis' motion to transfer the charges to juvenile court and a motion to suppress. In support of his motion to transfer, Davis presented three medical reports outlining Davis' mental disorders. The court later denied the motion to transfer. In July, Davis appeared with counsel and waived his right to a jury trial.

3. DAVIS' TRIAL
The same judge who had ruled on Davis' motion to transfer the case to juvenile court presided over the trial. During opening statements to the court, Davis' trial counsel conceded that Davis did fire the weapon that killed Campbell. Davis' trial counsel asked the court to convict Davis of manslaughter based on a lack of evidence regarding malice. Counsel argued that Campbell provoked Davis, that Davis was confused and disoriented, and that he did not act with good judgment. In delivering the verdict, the judge specifically stated that he was aware of Davis' mental impairment and history of hospitalizations. He also stated that the evidence did not support a manslaughter conviction. At the sentencing, the judge reiterated that he had taken Davis' mental problems and terrible home life into account when determining the sentence. The judge sentenced Davis to life imprisonment for the *372 murder conviction and 10 years' imprisonment for the weapon conviction.
In 1994, Davis appealed the convictions but withdrew the appeal based on counsel's erroneous advice regarding Davis' eligibility for parole. In November 2003, Davis moved for postconviction relief, alleging ineffective assistance of counsel. On January 16, 2008, the Douglas County District Court determined that Davis' trial counsel's advice to withdraw his appeal was deficient and that the advice denied Davis his direct appeal. Davis now appeals his 14-year-old sentence of life imprisonment.

III. ASSIGNMENTS OF ERROR
Davis assigns, consolidated, restated, and renumbered, that the district court erred in (1) finding sufficient evidence to find Davis guilty beyond a reasonable doubt of second degree murder, (2) including malice as an element of second degree murder, (3) imposing an excessive sentence of life imprisonment, and (4) failing to find that Davis' counsel provided ineffective assistance.

IV. ANALYSIS

1. SUFFICIENCY OF EVIDENCE
Davis contends that the evidence was not sufficient for the court to find him guilty beyond a reasonable doubt of second degree murder.

(a) Standard of Review
When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

(b) Resolution
Our standard of review as stated above requires substantial deference to the factual findings made by the trial court. We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact.[2]
The court convicted Davis of second degree murder. "A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation."[3] In contrast, "[a] person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act."[4] Davis contends that the record lacks sufficient evidence to find him guilty beyond a reasonable doubt of second degree murder. Instead, Davis claims that the evidence is consistent with manslaughter under the "sudden quarrel" element. A sudden quarrel requires provocation which causes a reasonable person to lose normal self-control.[5]
Although immediately before the shooting, an argument had erupted between Campbell and a member of Davis' group, the argument did not include Davis; nor *373 had any of the individuals in either group displayed any weapons. What punctures Davis' manslaughter theory is that after the first shot, 5 to 30 seconds elapsed before he walked up to Campbell and shot him execution-style in the back of the head. Despite Davis' arguments, the evidence clearly shows no "sudden quarrel" or adequate provocation that hindered Davis' ability to act rationally and reasonably. The court did not err in finding beyond a reasonable doubt that Davis intentionally killed Campbell.
Viewed in a light most favorable to the State, the evidence is sufficient to support a second degree murder conviction.

2. MALICE AS AN ELEMENT OF SECOND DEGREE MURDER

(a) Standard of Review
When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.[6]

(b) Resolution
Davis asserts that the trial court used the wrong standard for second degree murder when it found that Davis killed Campbell intentionally and with malice. Since 1978, § 28-304 has provided that "[a] person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." Before 1977, the second degree murder statute defined such a killing as one done "purposely and maliciously."[7] Despite this statutory change in the definition of second degree murder, this court continued to include malice as a necessary element of second degree murder until 1998.[8] In State v. Burlison,[9] we held that malice is not a necessary element of second degree murder under § 28-304. But under the law as it existed in 1994, when Davis was convicted and sentenced, malice was an element of second degree murder.[10]
Although malice was an element of second degree murder at the time of Davis' conviction, we have concluded that Burlison may be applied retroactively to a criminal act that occurred before Burlison was decided.[11] So Davis' allegation is correct that malice was not required for Davis' second degree murder conviction. We conclude, however, that the district court's finding of malice was not prejudicial to Davis because it created a greater burden on the State regarding intent.[12] By finding that Davis had to have acted with malice, the court imposed a higher burden on the State than was required under Burlison. Because the State nonetheless satisfied this higher burden, it clearly would have satisfied its burden of proof had it not been required to show malice. Thus, we conclude that Davis was not prejudiced by the required showing of malice for his conviction.
Because malice is not an element of second degree murder, the trial court placed a greater burden of proof on the *374 State. We conclude that Davis was not prejudiced.

3. INEFFECTIVE ASSISTANCE OF COUNSEL

(a) Standard of Review
A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal.[13] The determining factor is whether the record is sufficient to adequately review the question.[14] If a matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal.[15]

(b) Resolution
Davis alleges that he received ineffective assistance of trial counsel. He asserts that (1) counsel was ineffective because despite his young age and with mental health issues, counsel allowed him to waive his right to a jury trial; (2) counsel was ineffective for advising Davis to waive his right to testify; and (3) counsel was ineffective because he did not present evidence of Davis' mental condition during the trial and did not have Davis undergo a competency examination before trial.
We determine that an evaluation of defense counsel's actions would require an evaluation of trial strategy and of matters not contained in the record. We do not, and cannot, determine on direct appeal whether Davis received ineffective assistance of counsel because the record lacks sufficient evidence regarding defense counsel's strategy or lack thereof. We conclude that the record on direct appeal is not sufficient to adequately review these claims of ineffective assistance.

4. EXCESSIVE SENTENCE

(a) Standard of Review
An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[16]

(b) Resolution
The sentence of life imprisonment imposed on Davis by the district court fell within the statutory sentencing limits for second degree murder. Accordingly, we review the sentence for abuse of discretion.[17] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[18] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[19] We have listed factors that control any sentence imposed by the district court:
In imposing a sentence, a judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding *375 conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime.[20]
Davis alleges that the district court's sentence of life imprisonment was an abuse of discretion because the district court did not seriously consider all of the relevant mitigating factors.
At the time of the shooting, Davis was 16 years old. He had an unstructured homelife. The State had him removed from his biological mother's home at age 5, and he had been in 17 different foster homes. He had been hospitalized five times for various mental illnesses, including bipolar disorder, explosive behavior, mixed personality disorder, active suicidal ideation, and substance abuse and dependency. He also had a history of mental and physical abuse.
Davis did not have any adult convictions before the shooting. But beginning at age 10, Davis had a history of incidents with the police for criminal mischief, disturbing the peace, theft, and assault. Davis also had a history of running away from foster homes and not attending school. In sum, Davis had an extensive history of behavioral problems and a lack of respect for the law.
The court stated that while it was conscious of Davis' history of mental health problems and his unstable home life, it could not overlook the casual disregard Davis had for Campbell's life. The court concluded that the evidence showed Davis shot Campbell without provocation or justification, resulting in the callous murder of Campbell. The court stated that any lesser sentence under these circumstances, even when considering the mitigating factors, would diminish the seriousness of the crime. The court also feared that if Davis were to be eligible for parole, he could be a continued threat to society.
Although Davis' youth and troubled background might merit some sympathy, we cannot ignore his gruesome crime. We conclude that the district court did not abuse its discretion by sentencing Davis to life imprisonment. We affirm Davis' convictions and the sentences imposed.
AFFIRMED.
NOTES
[1] State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
[2] State v. Iromuanya, supra note 1. See State v. Sanders, 269 Neb. 895, 697 N.W.2d 657 (2005).
[3] Neb.Rev.Stat. § 28-304 (Reissue 1995).
[4] Neb.Rev.Stat. § 28-305 (Reissue 1995).
[5] State v. Pettit, 233 Neb. 436, 445 N.W.2d 890 (1989), overruled on other grounds, State v. Jones, 245 Neb. 821, 515 N.W.2d 654 (1994).
[6] State v. Louthan, 257 Neb. 174, 595 N.W.2d 917 (1999).
[7] Neb.Rev.Stat. § 28-402 (Reissue 1975).
[8] See, e.g., State v. Ryan, 249 Neb. 218, 543 N.W.2d 128 (1996); State v. Manzer, 246 Neb. 536, 519 N.W.2d 558 (1994); State v. Myers, 244 Neb. 905, 510 N.W.2d 58 (1994).
[9] State v. Burlison, 255 Neb. 190, 583 N.W.2d 31 (1998).
[10] See State v. Grimes, 246 Neb. 473, 519 N.W.2d 507 (1994), overruled, State v. Burlison, supra note 9.
[11] See State v. Redmond, 262 Neb. 411, 631 N.W.2d 501 (2001).
[12] See State v. Jackson, 258 Neb. 24, 601 N.W.2d 741 (1999).
[13] State v. Walker, 272 Neb. 725, 724 N.W.2d 552 (2006); State v. Faust, 265 Neb. 845, 660 N.W.2d 844 (2003), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007).
[14] Id.
[15] Id.
[16] See, State v. Reid, 274 Neb. 780, 743 N.W.2d 370 (2008); State v. Timmens, 263 Neb. 622, 641 N.W.2d 383 (2002).
[17] State v. Iromuanya, supra note 1. See State v. Thomas, 268 Neb. 570, 685 N.W.2d 69 (2004).
[18] State v. Reid, supra note 16.
[19] Id.; State v. Iromuanya, supra note 1.
[20] State v. Timmens, supra note 16, 263 Neb. at 631, 641 N.W.2d at 390-91. Accord State v. Iromuanya, supra note 1.