765 N.W.2d 192 (2009)
277 Neb. 663
STATE of Nebraska, appellee,
v.
Abram L. PAYAN, appellant.
No. S-08-598.
Supreme Court of Nebraska.
May 1, 2009.
*196 Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.
Jon Bruning, Attorney General, J. Kirk Brown, and Kimberly A. Klein for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
STEPHAN, J.
After a jury found Abram L. Payan guilty of one count of first degree sexual assault and one count of false imprisonment, the trial judge sentenced him to a term of 18 to 25 years' imprisonment on the sexual assault conviction and 5 to 5 years' imprisonment on the false imprisonment conviction, with the sentences to run concurrently. The trial judge made a finding that the sexual assault conviction constituted an "aggravated offense" as defined by the Sex Offender Registration Act (SORA)[1] and that therefore, Payan was *197 subject to the lifetime registration requirement of SORA and lifetime community supervision pursuant to Neb.Rev.Stat. § 83-174.03 (Reissue 2008) following his release from prison. In this direct appeal, Payan contends that the trial court erred in determining that he had committed an aggravated offense and further erred in imposing an excessive sentence.

I. BACKGROUND
In an amended information filed in the district court for Lancaster County, Payan was charged with first degree sexual assault by a person 19 years of age or older subjecting a person at least 12 years of age but less than 16 years of age to sexual penetration, a Class II felony.[2] He was also charged with first degree false imprisonment by knowingly restraining a person under terrorizing circumstances or under circumstances which exposed the victim to the risk of serious bodily injury, a Class IIIA felony.[3] Payan was tried by a jury.
C.N., whose date of birth is November 14, 1992, testified to events occurring in Lancaster County, Nebraska, on September 8 and 9, 2007. C.N. lived across the street from Payan and was at home on the evening of September 8. She testified that Payan called and asked her to "hang out" with him and several others, including his nephew and another male who were classmates of C.N. Payan said that they would not be gone long and that C.N. would not get in trouble. C.N. decided to join the group. She left her home through a basement window and entered the back seat of Payan's vehicle, where C.N.'s two male classmates were seated. An older individual known as Ason was seated in the front passenger seat.
Payan drove for some distance and then stopped at a store. He and Ason went inside, leaving C.N. and the others in the vehicle. C.N. testified that while Payan and Ason were in the store, she told her classmates that she was frightened because of a prior experience with Payan but that Payan's nephew and the other male assured her they would not let anything happen to her.
When Payan and Ason returned to the vehicle, Payan drove to an unlocked house in Lincoln, Nebraska. After C.N. and the four males entered the front door of the house, Payan and Ason blocked the door by placing a piece of furniture in front of it. C.N. testified that Payan gave her an alcoholic beverage in a shot glass and insisted that she drink it. After initially resisting, she drank several shots, because she did not feel that she had a choice. C.N. testified that she did not feel well after consuming the alcohol and went to a bedroom of the home to lie down. When Payan entered the bedroom, C.N. left the room and rejoined the others, who had remained in the front room of the home. One of C.N.'s classmates testified that while C.N. was in the bedroom, Payan stated that he intended to use his knife to coerce C.N. to perform oral sex.
C.N. testified that when she returned to the front room, Payan, who was also now in the front room, displayed a knife and told her he would kill her if she did not comply with his instructions. She testified that Payan then subjected her to oral and anal penetration in the presence of the others in the room. C.N. testified that Payan then took her to the bedroom to perform oral sex on Ason. C.N.'s testimony regarding these events was corroborated by the testimony of one of her male *198 classmates, who stated that he was present and observed the events described by C.N. in her testimony.
All five persons then left the house. C.N. testified that Payan dropped her off in front of his home and told her not to call the police. Instead of entering her home, C.N. walked to a friend's house, arriving after 1 a.m. on September 9, 2007. She told her friend what had occurred. He and another friend drove her to her home at approximately 7 a.m. on September 9.
Payan testified in his own defense. He was born on August 5, 1984, and was 23 years old in September 2007. He testified that he was acquainted with C.N., but denied that he had engaged in sexual acts with her. Payan's 15-year-old nephew also testified for the defense. He denied that he was present at the time of the alleged assault and testified that he had never seen Payan engage in sex with C.N.
After the jury returned guilty verdicts on both charges, the district court ordered a presentence investigation report and subsequently conducted a sentencing hearing. At that hearing, Payan's counsel objected to any finding that the sexual assault conviction constituted an aggravated offense under SORA. He argued that the elements of the offense did not meet the statutory definition of an aggravated offense and that any factual finding by the court would violate the constitutional principles articulated by the U.S. Supreme Court in Apprendi v. New Jersey.[4] The district court made a specific finding that Payan's conviction on the sexual assault charge constituted an aggravated offense triggering the lifetime registration requirement under SORA and lifetime community supervision. At the sentencing hearing, Payan signed documents acknowledging that he had been advised of these requirements. Payan was sentenced to a term of 18 to 25 years' imprisonment on the sexual assault conviction and 5 to 5 years' imprisonment on the false imprisonment conviction, with the sentences to run concurrently.
Payan perfected this timely appeal, and both parties filed petitions to bypass, which we granted.

II. ASSIGNMENTS OF ERROR
Payan assigns that (1) the court erred in finding that he is subject to lifetime sex offender registration, (2) the court erred in finding that he is subject to lifetime supervision by the Office of Parole Administration, and (3) his sentence on the sexual assault conviction was excessive.

III. STANDARD OF REVIEW
[1, 2] Whether a criminal defendant has been denied a constitutional right to a jury trial presents a question of law.[5] When deciding questions of law, an appellate court is obligated to reach conclusions independent of those reached by the trial court.[6]
[3] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.[7]

IV. ANALYSIS

1. AGGRAVATED OFFENSE FINDING
SORA applies to any person who pleads guilty to or is found guilty of certain listed *199 offenses, including sexual assault as defined by § 28-319 or Neb.Rev.Stat. § 28-320 (Reissue 2008).[8] SORA includes a general requirement that persons convicted of these listed offenses must register with the sheriff of the county in which he or she resides[9] during any period of supervised release, probation, or parole and "for a period of ten years after the date of discharge from probation, parole, or supervised release or release from incarceration, whichever date is most recent."[10]
Certain sex offenders, however, are subject to a lifetime registration requirement. Section 29-4005(2) provides:
A person required to register under section 29-4003 shall be required to register under [SORA] for the rest of his or her life if the offense creating the obligation to register is an aggravated offense, if the person has a prior conviction for a registrable offense, or if the person is required to register as a sex offender for the rest of his or her life under the laws of another state, territory, commonwealth, or other jurisdiction of the United States. A sentencing court shall make that fact part of the sentencing order.
The lifetime community supervision provisions of § 83-174.03 incorporate and mirror the lifetime registration provisions of SORA.[11] According to § 83-174.03(1), a defendant who commits an aggravated offense as defined by SORA "shall, upon completion of his or her term of incarceration or release from civil commitment, be supervised in the community by the Office of Parole Administration for the remainder of his or her life."
[4] SORA defines an aggravated offense as "any registrable offense under section 29-4003 which involves the penetration of (i) a victim age twelve years or more through the use of force or the threat of serious violence or (ii) a victim under the age of twelve years."[12] Payan argues that he was not convicted of an aggravated offense as defined by SORA, because the elements of first degree sexual assault as charged in the amended information did not include either the use of force or the threat of serious violence or a victim under the age of 12 years. We recently rejected a similar contention in State v. Hamilton,[13] concluding that under SORA, a sentencing judge need not consider only the elements of an offense in determining whether an aggravated offense as defined in § 29-4005(4)(a) has been committed. Instead, the court may make this determination based upon information contained in the record. Payan's argument that the aggravated offense determination under SORA must be based solely upon the elements of the charged offense is without merit.

2. APPRENDI/BLAKELY ARGUMENT
[5, 6] Alternatively, Payan argues that any factual finding of an aggravated offense must be made by a jury. This issue was neither raised nor addressed in Hamilton. Payan's argument relies upon the principle established by Apprendi that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and *200 proved beyond a reasonable doubt."[14] This principle is based upon the Due Process Clause of the 5th Amendment and the jury trial guarantees of the 6th Amendment, as made applicable to the states by the 14th Amendment.[15]Apprendi involved a state statute which permitted a judge to impose an extended term of imprisonment if the judge found by a preponderance of the evidence that in committing the crime, the defendant acted with the purpose of intimidation based upon race, color, gender, handicap, religion, sexual orientation, or ethnicity. Concluding that such a finding would be constitutionally impermissible, the U.S. Supreme Court reasoned that the legislature could not "`remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'"[16] Subsequently, in Blakely v. Washington,[17] the Court held that "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."
In applying the Apprendi/Blakely principle to the issues in this case, we must consider whether the aggravated offense finding made by the sentencing judge subjected Payan to punishment which could be imposed on the basis of the jury verdict alone.[18] Because Payan's sentence of imprisonment for the sexual assault conviction is within the 1- to 50-year statutory range for a Class II felony,[19] the narrower question is whether the lifetime registration requirement under SORA and the lifetime community supervision requirement under § 83-174.03 constitute punishment.

(a) Lifetime Registration
[7, 8] We have previously addressed the question of whether SORA registration requirements are punitive in the context of an ex post facto challenge. In State v. Worm,[20] the defendant argued that the lifetime registration requirement under SORA was punitive in nature and therefore in violation of the ex post facto clause as applied to him. We analyzed this issue under the "intent-effects" test established by the U.S. Supreme Court which requires an initial determination of whether the Legislature intended the statute to be criminal or civil.[21] If a court determines that the Legislature intended a statutory scheme to be civil, that intent will be rejected "`"only where a party challenging the [statute] provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention."'"[22] In Worm, we first concluded that in enacting SORA, the "Legislature intended to create a civil regulatory scheme to protect the public from the danger posed by sex offenders, which *201 intent is not altered by the statute's structure or design."[23] We then examined the factors set out by the U.S. Supreme Court in Kennedy v. Mendoza-Martinez[24] to determine whether the effect of the statute was so punitive as to negate the Legislature's intent. These factors include:
"(1) `[w]hether the sanction involves an affirmative disability or restraint'; (2) `whether it has historically been regarded as a punishment'; (3) `whether it comes into play only on a finding of scienter'; (4) `whether its operation will promote the traditional aims of punishmentretribution and deterrence'; (5) `whether the behavior to which it applies is already a crime'; (6) `whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) `whether it appears excessive in relation to the alternative purpose assigned.'"[25]
We concluded in Worm that SORA's offense categories and registration periods were reasonably related to the danger of recidivism and consistent with SORA's regulatory objective of assisting law enforcement in future efforts to investigate and resolve sex offenses. We concluded that the registration provisions had not been shown to be so punitive in either purpose or effect as to negate the Legislature's intention to create a civil regulatory scheme. We wrote, "Because the registration provisions are not punitive, we defer to the Legislature's determination of what remedial action is necessary to achieve the Legislature's goals."[26]
The intent-effects test utilized in Worm to determine whether a statute was civil or punitive for purposes of ex post facto analysis has also been applied to make this determination in a double jeopardy context.[27] But previously, in State v. Schneider,[28] we declined to employ the intent-effects test to determine whether a court was required to advise a defendant of the SORA registration requirements before accepting a no contest plea. Instead, following the holdings of other state courts, we concluded that a court is not required to inform a defendant of the "collateral consequence of the duties imposed under [SORA] before accepting his pleas."[29]
[9, 10] Because Apprendi/Blakely focuses upon whether a defendant is subjected to punishment beyond that which is permissible on the basis of the jury verdict alone, we conclude that the intent-effects test is the appropriate standard to determine whether the lifetime registration requirement under SORA and the lifetime community supervision requirement under § 83-174.03 are punitive in nature. If they are not, there can be no Apprendi/Blakely error. Based upon our holding in Worm that the registration provisions of SORA are not punitive, the trial judge's finding of an aggravating offense triggering the lifetime reporting provisions did *202 not violate the constitutional principles articulated in Apprendi and Blakely.

(b) Lifetime Community Supervision
[11] The same finding of an aggravated offense also triggers the lifetime community supervision provisions of § 83-174.03. We have not previously determined whether those provisions are civil or penal in nature. We do so now, considering first whether the Legislature intended the statute to be civil or punitive in nature.
Section 83-174.03 will pass the intent prong of the intent-effects test if the Legislature intended it to be a part of a civil regulatory scheme to remedy a present situation and the restriction to the individual comes about as a relevant incident to the regulation.[30] Whether the Legislature intended the statute to be civil or criminal is primarily a matter of statutory construction. However, we must also look at the statute's structure and design.[31] Although § 83-174.03 incorporates the aggravated offense finding from SORA as one of the events which may trigger the lifetime community supervision requirement, it is not actually a part of SORA. The text of § 83-174.03 originated in L.B. 1199,[32] a 2006 "comprehensive bill that amend[ed] several provisions of law with respect to sex offenses and convicted sex offenders."[33] L.B. 1199 created new sex offenses, amended SORA, and mandated lifetime community supervision for certain sex offenders. According to the Judiciary Committee's summary:
L.B. 1199 provides for lifetime supervision after release from prison or civil commitment for repeat sex offenders and first time offenders convicted of rape of a child under twelve years of age or forcible rape of a person over twelve years of age. Supervision shall be provided by the office of parole administration. Each individual subject to supervision shall be evaluated by [the] office of parole administration and have conditions of supervision imposed which are the least restrictive conditions that are compatible with public safety.[34]
A key factor in determining the legislative intent of § 83-174.03 is the fact that the statute requires persons subjected to lifetime community supervision to be supervised by the Office of Parole Administration, a component of the Department of Correctional Services, which is responsible for all parole services in the community.[35] Section 83-174.03 is codified in chapter 83, article 1(f), of the Nebraska Revised Statutes pertaining to "Correctional Services, Parole, and Pardons." The term "parole" has a distinctively penal connotation. It is generally defined as "[t]he release of a prisoner from imprisonment before the full sentence has been served."[36] In a case holding that a suspicionless search of a parolee did not violate the Fourth Amendment, the U.S. Supreme Court referred to parole as "`an established variation *203 on imprisonment of convicted criminals'" and to parolees as being "on the `continuum' of state-imposed punishments."[37] Nebraska law defines "[p]arole term" as "the time from release on parole to the completion of the maximum term, reduced by good time."[38]
Unlike the SORA registration requirements, § 83-174.03 subjects the offender who has completed a prison sentence to significant affirmative restraints which may be imposed by the Office of Parole Administration. Some of these are similar to restrictions which may be imposed upon incarcerated persons paroled before their mandatory release date.[39] These include restrictions on place of residence[40]; required reporting to a parole officer[41]; and submission to medical, psychological, psychiatric, or other treatment.[42] In addition, persons subject to lifetime community supervision may be subject to drug and alcohol testing, restrictions on employment and leisure activities, and polygraph examinations.[43]
A majority of the courts which have considered lifetime community supervision statutes similar to § 83-174.03 have concluded that they are punitive in nature, reasoning that "post-release supervision increases the maximum range of an offender's sentence, thereby directly and immediately affecting the defendant's punishment."[44] The State has called our attention to one case holding otherwise, an unpublished opinion of the Court of Criminal Appeals of Tennessee in which the majority of a divided panel concluded that lifetime community supervision did not constitute punishment, because it was motivated by protective and rehabilitative aims.[45] A dissenting judge agreed with the majority of courts holding that a lifetime community supervision requirement imposed at the time of sentencing was punitive in nature.[46]
We likewise agree with the majority view on this issue. Lifetime community supervision under § 83-174.03 begins upon completion of the offender's term of incarceration or release from civil commitment. It involves affirmative restraints and disabilities similar to and arguably greater than traditional parole. It is not dependent upon any finding that the offender poses a risk to the safety of others at the time he or she completes a period of incarceration or civil commitment. We therefore conclude that the legislative intent in enacting § 83-174.03 was to establish an additional form of punishment for some sex offenders.
*204 [12, 13] In this case, the imposition of lifetime community supervision was triggered by the finding of the trial judge, not the jury, that Payan had committed an aggravated offense as defined by SORA. This constitutes error under Apprendi and Blakely, because the punishment imposed on the basis of this finding is beyond that which would have been permissible on the basis of the jury verdict alone, i.e., imprisonment for a maximum of 50 years. We hold that where the facts necessary to establish an aggravated offense as defined by SORA are not specifically included in the elements of the offense of which the defendant is convicted, such facts must be specifically found by the jury in order to impose lifetime community supervision under § 83-174.03 as a term of the sentence. We specifically note that the finding of an aggravated offense need not be made by a jury if utilized only to impose the nonpunitive lifetime registration requirements of SORA.[47]

(c) Harmless Error Analysis
[14] The U.S. Supreme Court has recognized that most constitutional error can be harmless.[48] Constitutional error is subject to automatic reversal only in those limited instances where the Court has determined that the error is "`structural.'"[49] In Washington v. Recuenco,[50] the Court held that an Apprendi/Blakely error in failing to submit a sentencing factor to the jury was not structural error and was subject to harmless error analysis. We therefore consider whether the error in this case was harmless.
[15, 16] In performing a harmless error analysis, our normal inquiry is whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[51] But that standard does not logically fit the circumstance presented here, where the error was a failure to require the jury to decide a factual question pertaining only to the enhancement of the sentence, not to the determination of guilt. We hold that the appropriate harmless error standard in this circumstance is whether the record demonstrates beyond a reasonable doubt that a rational jury would have found the existence of the sentencing enhancement factor.[52]
[17] The jury found Payan guilty of a sex offense which included penetration as an element. Because C.N. was over the age of 12, the crime could be an aggravated offense only if it was committed "through the use of force or the threat of serious violence."[53] The jury heard two distinct versions of the facts. C.N. and one eyewitness testified that the assault occurred after Payan displayed a knife and threatened to kill C.N. if she did not submit to his sexual advances. Payan and one other witness testified that the assault never occurred. There is no evidence that the assault occurred under circumstances which did not involve the use of force or the threat of serious violence. On this record, any rational jury which convicted Payan of the sexual assault would have *205 also concluded that it was committed through the use of force or the threat of serious violence. Accordingly, we conclude that the making of this finding by the trial judge instead of the jury was harmless error.

3. EXCESSIVE SENTENCE ARGUMENT
[18-20] Payan argues that his sentence of imprisonment for 18 to 25 years on his sexual assault conviction was excessive. Payan was convicted of a Class II felony punishable by imprisonment for a minimum of 1 year and a maximum of 50 years.[54] Because Payan's sentence falls within the statutory range, we may alter it only if we conclude that it constituted an abuse of judicial discretion.[55] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[56]
[21-23] In imposing a sentence, the sentencing court is not limited to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[57] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[58]
Payan was 23 years old at the time of the assault. He dropped out of high school but later obtained his diploma through the GED program while at the Work Ethic Camp after a probation violation. He has two young children, one living in Lincoln and the other in Las Vegas, Nevada. He has assaulted the mothers of both children. He pled guilty to second degree kidnapping and battery constituting domestic violence against the mother of his youngest child in 2006 in Las Vegas. He was sentenced to 6 months in jail with the sentence suspended, and he was required to attend domestic violence counseling. Payan assaulted the mother of his oldest child in 2004, when she attempted to end their relationship. He spent 10 days in jail for that assault.
In 2004, Payan pled guilty to an amended charge of attempted robbery, for which he was sentenced to 90 days in jail and 4 years' probation. The probation was extended to 5 years after a violation, and Payan was placed on intensive supervision probation and committed to Work Ethic Camp. According to the presentence investigation report, during the robbery, Payan placed a knife at the victim's throat and demanded money for his next methamphetamine "`fix.'"
Payan reported alcohol abuse and drug use, specifically, near daily use of marijuana from the age of 12 until 2005 and weekly methamphetamine use for a period of 2 years ending in 2004. Tests administered as a part of the presentence investigation report assessed Payan as being at *206 very high risk in categories measuring alcohol abuse, drug abuse or relapse, violence, antisocial behavior, aggressiveness, and poor stress coping.
We need not reiterate the egregious facts upon which his current sexual assault conviction is based. Taking into account all relevant factors, we conclude that the district court did not abuse its discretion in sentencing Payan.

V. CONCLUSION
In summary, we conclude that the finding that Payan committed an aggravated offense was properly made by the trial judge for purposes of the lifetime registration provisions of SORA, which are civil in nature, but the question should have been submitted to the jury for the purpose of lifetime community supervision pursuant to § 83-174.03, which is punitive. We conclude, however, that this error was harmless and does not require reversal. We further conclude that Payan's sentence was not excessive, and we affirm the judgment of the district court in all respects.
AFFIRMED.
MILLER-LERMAN, J., participating on briefs.
NOTES
[1] See Neb.Rev.Stat. § 29-4001 to 29-4014 (Reissue 2008).
[2] Neb.Rev.Stat. § 28-319(1) and (2) (Reissue 2008).
[3] Neb.Rev.Stat. § 28-314 (Reissue 2008).
[4] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[5] State v. Clapper, 273 Neb. 750, 732 N.W.2d 657 (2007).
[6] State v. Kuhl, 276 Neb. 497, 755 N.W.2d 389 (2008).
[7] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
[8] § 29-4003(1)(a)(iii).
[9] § 29-4004(1).
[10] § 29-4005(1).
[11] State v. Hamilton, 277 Neb. 593, 763 N.W.2d 731 (2009); State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008).
[12] § 29-4005(4)(a).
[13] State v. Hamilton, supra note 11.
[14] Apprendi v. New Jersey, supra note 4, 530 U.S. at 490, 120 S.Ct. 2348.
[15] Apprendi v. New Jersey, supra note 4.
[16] Id., 530 U.S. at 490, 120 S.Ct. 2348, quoting Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (Stevens, J., concurring).
[17] Blakely v. Washington, 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (emphasis in original).
[18] See id.
[19] Neb.Rev.Stat. § 28-105 (Reissue 2008).
[20] State v. Worm, 268 Neb. 74, 680 N.W.2d 151 (2004).
[21] See Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).
[22] State v. Worm, supra note 20, 268 Neb. at 82, 680 N.W.2d at 160, quoting State v. Isham, 261 Neb. 690, 625 N.W.2d 511 (2001).
[23] Id. at 84, 680 N.W.2d at 161.
[24] Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).
[25] State v. Isham, supra note 22, 261 Neb. at 695, 625 N.W.2d at 515-16 (2001), quoting Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).
[26] State v. Worm, supra note 20, 268 Neb. at 88, 680 N.W.2d at 163.
[27] See, Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); State v. Howell, 254 Neb. 247, 575 N.W.2d 861 (1998).
[28] State v. Schneider, 263 Neb. 318, 640 N.W.2d 8 (2002).
[29] Id. at 324, 640 N.W.2d at 13.
[30] See, State v. Worm, supra note 20; Artway v. Attorney General of State of N.J., 81 F.3d 1235 (3d Cir.1996).
[31] State v. Worm, supra note 20. See, also, State v. Isham, supra note 22.
[32] 2006 Neb. Laws, L.B. 1199, § 89.
[33] Introducer's Statement of Intent, Judiciary Committee, 99th Legislature, 2d Sess. (Feb. 16, 2006).
[34] Bill Summary, Judiciary Committee, 99th Legislature, 2d Sess. (Feb. 16, 2006).
[35] See Neb.Rev.Stat. § 83-1.100 (Reissue 2008).
[36] Black's Law Dictionary 1149 (8th ed. 2004).
[37] Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), quoting United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), and Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
[38] Neb.Rev.Stat. § 83-170(11) (Reissue 2008).
[39] See Neb.Rev.Stat. § 83-1,116 (Reissue 2008).
[40] §§ 83-174.03(4)(d) and 83-1,116(1)(e).
[41] §§ 83-174.03(4)(c) and 83-1,116(1)(d).
[42] §§ 83-174.03(4)(f) and 83-1,116(1)(f).
[43] § 83-174.03(4)(a), (b), and (f).
[44] Palmer v. State, 118 Nev. 823, 828-29, 59 P.3d 1192, 1195 (2002). See, State v. Jamgochian, 363 N.J.Super. 220, 832 A.2d 360 (2003); State v. Baugh, No. 06-1599, 2008 WL 782742 (Iowa App. Mar. 26, 2008) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 752 N.W.2d 34 (Iowa App.2008)).
[45] Ward v. State, No. W2007-01632-CCA-R3-PC, 2009 WL 113236 (Tenn.Crim.App. Jan. 14, 2009).
[46] Id. (Tipton, Presiding Judge, dissenting).
[47] State v. Hamilton, supra note 11.
[48] Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).
[49] Id., 527 U.S. at 8, 119 S.Ct. 1827.
[50] Washington v. Recuenco, 548 U.S. 212, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006).
[51] See State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[52] See, Neder v. United States, supra note 48; Galindez v. State, 955 So.2d 517 (Fla.2007); Adams v. State, 336 Mont. 63, 153 P.3d 601 (2007); State v. Bowen, 220 Or.App. 380, 185 P.3d 1129 (2008).
[53] § 29-4005(4)(a)(i).
[54] §§ 28-105 and 28-319(1) and (2).
[55] See State v. Draganescu, supra note 7.
[56] State v. Davis, 276 Neb. 755, 757 N.W.2d 367 (2008); State v. Reid, 274 Neb. 780, 743 N.W.2d 370 (2008).
[57] State v. Albers, 276 Neb. 942, 758 N.W.2d 411 (2008).
[58] State v. Williams, 276 Neb. 716, 757 N.W.2d 187 (2008).