32 A.3d 190 (2011)
423 N.J. Super. 224
George C. RILEY, Appellant,
v.
NEW JERSEY STATE PAROLE BOARD, Respondent.
No. A-1004-09T1
Superior Court of New Jersey, Appellate Division.
Argued May 3, 2011.
Decided September 22, 2011.
*192 George C. Riley, appellant pro se, did not argue.
Christopher C. Josephson, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ellen M. Hale, Deputy Attorney General, on the brief).
Alison S. Perrone, Designated Counsel, argued the cause for amici curiae American Civil Liberties Union of New Jersey Foundation and New Jersey Office of the Public Defender (Yvonne Smith Segars, Public Defender, and American Civil Liberties Union of New Jersey, attorneys; Edward L. Barocas, Jeanne Locicero, and Michael Z. Buncher, Deputy Public Defender, of counsel; Ms. Perrone, of counsel and on the brief).
Before Judges PARRILLO, ESPINOSA and SKILLMAN.
The opinion of the court was delivered by
SKILLMAN, J.A.D. (retired and temporarily assigned on recall).
The issue presented by this appeal is whether retroactive application of the intensive monitoring and supervision of sex offenders provided under the Sex Offender Monitoring Act, N.J.S.A. 30:4-123.89 to -123.95, to persons who committed sex offenses before its enactment is prohibited by the Ex Post Facto Clauses of the United States and New Jersey Constitutions. We conclude that such retroactive application of the Act violates the Ex Post Facto Clauses. Therefore, we reverse the final decision of the Chairman of the Parole Board subjecting appellant to monitoring and supervision under the Act.

I.
Appellant was found guilty of an attempted sexual assault committed in 1986 and sentenced to an extended term of twenty years imprisonment, which was made consecutive to a sentence he was already serving for a violation of parole. On February 18, 2009, upon expiration of his maximum sentence, appellant was discharged from the Adult Diagnostic and Treatment Center without being subjected to a period of parole supervision.
On August 6, 2007, the Governor signed into law the Sex Offender Monitoring Act, which directed the Chairman of the Parole Board, in consultation with the Attorney General, to establish a program for the continuous, satellite-based monitoring of certain sex offenders. L. 2007, c. 128. The Law was made effective immediately.
On August 12, 2009, the Parole Board notified appellant that he was subject to monitoring and supervision under the Sex Offender Monitoring Act, based on the Law Division's determination that he was a Tier III offender under Megan's Law, N.J.S.A. 2C:7-1 to -19, with a high risk of reoffense, N.J.S.A. 30:4-123.91(a)(1). This notification was accompanied by a document, entitled "New Jersey State Parole Board Global Positioning Satellite (GPS) Monitoring Program Notice of Conditions," which appellant was required to sign, that described the program for monitoring and supervision of sex offenders established by the Chairman of the Parole Board. The introductory section of this document informed appellant that "[t]he GPS Monitoring Program requires that your physical location be monitored 24 hours a day/7 days a week." The document then set forth eleven conditions with which appellant was required to comply to assure such continuous monitoring:
1. You shall initially meet with the assigned monitoring Parole Officer for *193 installation of the GPS monitoring equipment.
2. You shall insure that the GPS tracking device is charged to its capacity on a daily basis and maintain the GPS tracking device in a charged mode whenever you leave your residence.
3. You shall provide immediate notice to the assigned monitoring Parole Officer if the GPS tracking device becomes inoperable.
4. You shall not tamper with, remove or damage or attempt to tamper with, remove or damage any of the GPS monitoring equipment installed at your residence, attached to your person or required to be carried by you.
5. You shall be responsible for the cost of repair and/or replacement of any of the GPS monitoring equipment that is lost or damaged.
6. You shall maintain and exercise continuous physical control over the GPS tracking device whenever you leave your residence.
7. You shall provide access to your residence at reasonable times to enable the assigned monitoring Parole Officer to perform required maintenance and/or diagnostics of the GPS monitoring equipment.
8. You shall provide immediate access to your residence whenever the assigned monitoring Parole Officer is required to investigate a report of non-compliance with a condition of the monitoring program.
9. You shall provide notice to the assigned monitoring Parole Officer not less than ten days prior to any change in your residence.
10. You shall provide notice to the assigned monitoring Parole Officer prior to any travel outside of the State of New Jersey.
11. You shall provide the assigned monitoring Parole Officer with:
a. the name, address and physical location of your current employment.
b. notice of any change in your employment or employment location within 24 hours of the change occurring.
c. your scheduled hours of work on a weekly basis.
On August 17, 2009, appellant sent a letter to the Parole Board objecting to the proposed imposition of these conditions on the ground that he had completed service of his sentence and was not subject to parole supervision. However, the Parole Board rejected these objections. A parole officer subsequently came to appellant's home and, under appellant's protest, installed the bracelet on his ankle and delivered the other equipment required to monitor appellant twenty-four hours a day, seven days a week.
The monitoring equipment consists of a transmitter, roughly the size of a pager, which is attached to the sex offender's ankle with a rubberized strap, and a tracking unit, roughly the size of a cell phone, which the individual must carry when he is away from home. The tracking unit must be plugged in and charged for one to two hours to receive a full charge. The charge lasts approximately fourteen to sixteen hours before the unit must be recharged.
Appellant is required to wear the ankle transmitter at all times and clip the GPS tracking unit to his waist when he leaves home in order for the device to track his location. When appellant is moving, data is continuously transmitted to a host computer using a wireless connection, and the location points collected by the tracker are stored in a database for three years. If the ankle transmitter loses touch with the tracking unit for too long a period, the *194 software will notify the monitoring officer, thereby affording parole officers an opportunity to respond and locate appellant.
When the parole officer installed the ankle bracelet and gave appellant the other monitoring equipment, he distributed another document, entitled "Global Positioning Satellite Monitoring Program Participant Information," which further explained the requirements of the Parole Board's program for the monitoring and supervision of sex offenders. This document states in part:
3. You are responsible for keeping your residential electrical service active. This utility is vital to your participation in the GPS monitoring program. If there is an interruption in your electrical service you must contact your Parole Officer or the parole emergency number during off hours (nights and weekends) immediately at 609-633-6703 or 800-668-7025.
4. You must always take the GPS tracking device with you when you leave your place of residence.
5. You must keep the GPS tracking device on your person at all times when you are outside of your place of residence.
6. You must keep your GPS tracking device charged sufficiently to provide GPS tracking at all times that you are outside of your residence.
....
8. If you are contacted via text message on your GPS tracking device you will hear a beeping sound. You must read the displayed message and you must comply with the instructions given. You must acknowledge receipt of all text messages by pressing the black button on the front of the GPS tracking device.
Appellant filed an administrative appeal of the Parole Board's decision to subject him to monitoring and supervision under the Sex Offender Monitoring Act. This appeal relied in part on the Ex Post Facto Clauses of the United States and New Jersey Constitutions.[1] On September 18, 2009, the Chairman of the Parole Board rejected appellant's appeal without referring to his claim that retroactive application of the Sex Offender Monitoring Act violates the Ex Post Facto Clauses.
Appellant has appealed from this decision, relying primarily upon the Ex Post Facto Clauses. We granted a motion by the Office of the Public Defender and the American Civil Liberties Union of New Jersey to participate in the appeal as amicus curiae in support of appellant's position.

II.
Before addressing appellant's argument that retroactive application of the Sex Offender Monitoring Act to a sex offender such as him violates the Ex Post Facto Clauses, we first note that the Act does not itself prescribe the details of the program it creates for monitoring and supervising sex offenders. Instead, the Act directs the Chairman of the Parole Board to "establish a program for the continuous, satellite-based monitoring of sex offenders in this State." N.J.S.A. 30:4-123.92(a). It also requires the Chairman to "promulgate guidelines to effectuate the provisions of this act." N.J.S.A. 30:4-123.92(d). It is at least arguable that the detailed provisions adopted by the Chairman to implement the *195 Act, which are set forth in the previously quoted "Notice of Conditions" and "Participant Information" documents distributed to appellant, constitute "[a]dministrative rule[s]," that is, "agency statement[s] of general applicability and continuing effect that implement[ ] or interpret[ ] law," N.J.S.A. 52:14B-2(e), which should have been adopted in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15. See Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 328-32, 478 A.2d 742 (1984). However, because appellant has not raised this argument,[2] we bypass it to address the primary question presented by the appeal, which is whether the Act, as implemented by the Chairman, violates the Ex Post Facto Clauses of the United States and New Jersey Constitutions.

III.
The State argues that application of the Sex Offender Monitoring Act to appellant does not violate the Ex Post Facto Clauses because the triggering event for its application was not his commission of a sexual offense in 1986 but rather his 2009 classification as a Tier III sex offender. However, the predicate for that classification was the conviction for the 1986 offense. While not all sex offenders who were convicted of an offense enumerated in N.J.S.A. 2C:7-2 fall within the purview of the Act, appellant's enrollment in the GPS program may be directly traced to his 1986 conviction. But for this predicate conviction, appellant would not have come under Megan's Law review and scrutiny for high risk assessment. N.J.S.A. 30:4-123.91(a)(1). Therefore, retroactive application of the Act to him must be evaluated under the Ex Post Facto Clauses.
This conclusion is supported by decisions of the Supreme Court of the United States and the Supreme Judicial Court of Massachusetts. In Johnson v. United States, 529 U.S. 694, 696-97, 120 S.Ct. 1795, 1798-99, 146 L.Ed.2d 727, 733-34 (2000), the Court was confronted with a question similar to the one presented by this appealwhether a 1994 statute authorizing imposition of an additional period of "supervised release" for a violation of a prior period of supervised release could be applied to a person who was convicted of an underlying offense before enactment of the statute. The circuit court of appeals concluded that such an application of the 1994 statute "was not retroactive at all, since revocation of supervised release [for the offense committed before enactment of the statute] was punishment for [the defendant's] violation of the conditions of the supervised release, which occurred after the 1994 amendments." Id. at 698-99, 120 S.Ct. at 1800, 146 L.Ed.2d at 735. Although ultimately deciding the appeal on other grounds, the Supreme Court rejected this analysis, stating that the 1994 statute "attribute[s] postrevocation penalties to the original conviction[,]" and "[s]ince postrevocation penalties relate to the original offense, to sentence [the defendant] to a further term of supervised release under the [1994 statute] would be to apply this section retroactively (and to raise the remaining ex post facto question, whether the application makes him worse off)." Id. at 701, 120 S.Ct. at 1801, 146 L.Ed.2d at 736.
*196 In Commonwealth v. Cory, 454 Mass. 559, 911 N.E.2d 187, 191-92 (2009), the court relied upon Johnson in concluding that application of the Massachusetts sex offender monitoring statute, which applies to any person "placed on probation" for a designated sex offense, to a person convicted before the statute's enactment, but not placed on probation under after enactment, constituted a retroactive application that required analysis under the Ex Post Facto Clause. In reaching this conclusion, the court noted that "[a] law is retrospective if it changes the legal consequences of acts completed before its effective date." Id. at 192 (quoting Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351, 360 (1987)); see also Doe v. Bredesen, 507 F.3d 998, 1003 (6th Cir.2007), reh'g en banc denied, 521 F.3d 680 (6th Cir.2008), cert. denied, 555 U.S. 921, 129 S.Ct. 287, 172 L.Ed.2d 210 (2008).
If the State were correct in its argument that there is no need to determine whether the Sex Offender Monitoring Act is punitive because the determination that appellant is subject to monitoring under the Act was made after its enactment, there would have been no need for our Supreme Court in Doe v. Poritz, 142 N.J. 1, 40-77, 662 A.2d 367 (1995), or the United States Supreme Court in Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), to have undertaken lengthy analyses of whether the Megan's Laws at issue in those cases violated the Ex Post Facto Clauses. Instead, the Courts could have avoided such analyses by simply holding that application of the Megan's Laws to persons who had committed sex offenses before their enactment was not retroactive because the determination whether particular sex offenders are subject to the laws was not made until after their enactment. Indeed, the post-Act determination that the State relies upon in arguing that application of the Sex Offender Monitoring Act to appellant was not retroactive is that he is presently a Tier III Megan's Law offender with a high risk of reoffense. Therefore, like the Megan's Laws involved in Poritz and Smith, application of the Sex Offender Monitoring Act to appellant was retroactive and must be evaluated under the Ex Post Facto Clauses.

IV.
Both the United States and New Jersey Constitutions forbid the legislative branch from passing ex post facto laws. Our Supreme Court has characterized the Ex Post Facto Clauses as "towering constitutional provisions of great importance to individual dignity, freedom, and liberty." Poritz, supra, 142 N.J. at 43, 662 A.2d 367. One prohibition of those Clauses is against imposition of "a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648, 650 (1798); see also Miller, supra, 482 U.S. at 429-36, 107 S.Ct. at 2450-54, 96 L.Ed.2d at 359.
The analytical framework for determining whether a statute imposes retroactive punishment prohibited by the Ex Post Facto Clause of the United States Constitution is set forth in Smith, supra, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164. A court must first determine whether "the intention of the legislature [in enacting the statute] was to impose punishment." Id. at 92, 123 S.Ct. at 1147, 155 L.Ed.2d at 176. If it was, "that ends the inquiry." Ibid. The statute will be found to violate the Ex Post Facto Clause. However, if the Legislature's "intention was to enact a regulatory scheme that is civil and nonpunitive," a court must then determine "whether the statutory scheme is `so punitive either in purpose or effect as to negate [the State's] intention to deem it civil.'" Ibid. (quoting Kansas v. Hendricks, 521 U.S. 346, 361, *197 117 S.Ct. 2072, 2082, 138 L.Ed.2d 501, 515 (1997)).
We conclude that although the Legislature's intention in enacting the Sex Offender Monitoring Act was civil and nonpunitive, the Act is so punitive in effect that it violates the Ex Post Facto Clause. We first consider the Legislature's intention.

A.
"[C]onsiderable deference must be accorded to the intent as the legislature has stated it," because "[a] conclusion that the legislature intended to punish would satisfy an ex post facto challenge without further inquiry into its effects." Smith, supra, 538 U.S. at 92-93, 123 S.Ct. at 1147, 155 L.Ed.2d at 177. In view of this required deference to the Legislature's stated intent, "`only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson v. United States, 522 U.S. 93, 100, 118 S.Ct. 488, 493, 139 L.Ed.2d 450, 459 (1997) (quoting United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742, 749 (1980)). In determining whether the Legislature's intent was to impose punishment or to establish a civil regulatory program, a court should consider "the statute's text and its structure." Smith, supra, 538 U.S. at 92, 123 S.Ct. at 1147, 155 L.Ed.2d at 177.
In Smith, the Court concluded that the text and structure of Alaska's version of Megan's Law indicated that the legislative intent was regulatory rather than punitive. Id. at 93-96, 123 S.Ct. at 1147-49, 155 L.Ed.2d at 177-79. In reaching this conclusion, the Court noted that the Alaska Legislature had "found that `sex offenders pose a high risk of reoffending,' and identified `protecting the public from sex offenders' as the `primary governmental interest' of the law," and also "determined that `release of certain information about sex offenders to public agencies and the general public will assist in protecting the public safety.'" Id. at 93, 123 S.Ct. at 1147, 155 L.Ed.2d at 177 (quoting 1994 Alaska Sess. Laws, c. 41, § 1). The Court accepted these statements of the Alaska Legislature's intent, observing that "nothing on the face of the statute suggests that the legislature sought to create anything other than a civil ... scheme designed to protect the public from harm." Id. at 93, 123 S.Ct. at 1147, 155 L.Ed.2d at 177 (quoting Hendricks, supra, 521 U.S. at 361, 117 S.Ct. at 2082, 138 L.Ed.2d at 515).
The Sex Offender Monitoring Act contains statements of legislative intent similar to those in the Alaska Megan's Law involved in Smith. Those statements include:
a. Offenders who commit serious and violent sex crimes have demonstrated high recidivism rates and, according to some studies, are four to five times more likely to commit a new sex offense than those without such prior convictions, thereby posing an unacceptable level of risk to the community.
b. Intensive supervision of serious and violent sex offenders is a crucial element in both the rehabilitation of the released inmate and the safety of the surrounding community.
c. Technological solutions currently exist to provide improved supervision and behavioral control of sex offenders following their release.
....
e. Continuous 24 hours per day, seven days per week, monitoring is a valuable and reasonable requirement for those offenders who are determined to be a high risk to reoffend....
[N.J.S.A. 30:4-123.90.]
*198 The fact that the Sex Offender Monitoring Act may achieve the additional purpose of aiding law enforcement by linking released offenders with crimes does not detract from the predominant regulatory design of the statutory scheme. Smith, supra, 538 U.S. at 93-94, 123 S.Ct. at 1147-48, 155 L.Ed.2d at 177-78. As with Megan's Lawunder which registrants provide notification to the chief law enforcement officer of the municipality, the Superintendent of the State Police maintains the Internet registry, and the Attorney General promulgates guidelines, Poritz, supra, 142 N.J. at 21-22, 662 A.2d 367; N.J.S.A. 2C:7-4, -6, -8, and -13the Parole Board's implementation of the GPS monitoring program under the Sex Offender Monitoring Act does not render the Act punitive in nature. See Smith, supra, 538 U.S. at 96, 123 S.Ct. at 1149, 155 L.Ed.2d at 179.
Where, as here, the stated legislative intent is remedial, those claiming a hidden punitive intent must show "the clearest proof" of that intent. Ward, supra, 448 U.S. at 249, 100 S.Ct. at 2641, 65 L.Ed.2d at 749. Appellant has failed to meet this heavy burden. To the contrary, the Sex Offender Monitoring Act's express legislative objectives reflect a civil scheme that is primarily regulatory in intent.

B.
The retroactive application of a statute to a person convicted of a crime will be found to violate the Ex Post Facto Clause of the United States Constitution, despite its regulatory intent, if its adverse effects are so punitive as to negate the State's intent to deem it only civil and regulatory. Smith, supra, 538 U.S. at 92, 123 S.Ct. at 1147, 155 L.Ed.2d at 176.
In determining whether the adverse effects of a statute constitute retroactive punishment prohibited by the Ex Post Facto Clause, a court should "refer to the seven factors noted in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)." Smith, supra, 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d at 179.[3] Those factors are whether the sanction (1) involves an affirmative disability or restraint; (2) has historically been regarded as punishment; (3) comes into play only on a finding of scienter; (4) will promote the traditional aims of punishmentretribution and deterrence; (5) applies to behavior that is already a crime; (6) may be rationally connected to an alternative nonpunitive purpose; and (7) appears excessive in relation to that alternative purpose. Mendoza-Martinez, *199 supra, 372 U.S. at 168-69, 83 S.Ct. at 567-68, 9 L.Ed.2d at 661. Although these factors "are `neither exhaustive nor dispositive,'" they provide a "useful framework" for analyzing the alleged punitive effects of a criminal statute. Smith, supra, 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d at 179 (quoting Ward, supra, 448 U.S. at 249, 100 S.Ct. at 2641, 65 L.Ed.2d at 750). Some of these factors may be more relevant than others in determining whether a particular statute imposes retroactive punishment prohibited by the Ex Post Facto Clause. See id. at 97-105, 123 S.Ct. at 1149-54, 155 L.Ed.2d at 180-85.
In our judgment, the most significant Mendoza-Martinez factors in analyzing the effects of the GPS monitoring program established by the Sex Offender Monitoring Act, as implemented by the Chairman of the Parole Board, are that it involves "affirmative disabilit[ies] [and] restraint[s]," and that those disabilities and restraints are similar to ones that have "historically been regarded as a punishment." 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661.
The adverse effects upon a sex offender of the monitoring and supervision program established by the Sex Offender Monitoring Act are substantially more severe than the adverse effects of the registration and notification provisions of Megan's Law the Court upheld in Smith. An offender subject to this program must wear a rubber bracelet on his ankle twenty-four hours a day, seven days a week. Appellant, who is seventy-seven years old, complains that this bracelet causes his leg to swell at night and is very uncomfortable when he sleeps or wears certain shoes. An offender such as appellant also must pay some of the costs of this intrusive supervision, including the electrical service required to recharge the tracking device and the cost of repair or replacement of any GPS monitoring equipment that is lost or damaged.
In addition, because the GPS tracking device must be recharged every sixteen hours, an offender may be prevented from traveling to and staying in a campground or other remote area without electrical service. And before a sex offender subject to the Sex Offender Monitoring Act can travel out-of-state, he must provide advance notice to his assigned parole officer. Compare Smith, supra, 538 U.S. at 101, 123 S.Ct. at 1152, 155 L.Ed.2d at 182 (noting that "offenders subject to the Alaska [Megan's Law] are free to move where they wish and to live and work as other citizens, with no supervision") (emphasis added).
Moreover, under the conditions of the monitoring and supervision program, a parole officer may enter the offender's residence at any time "to investigate a report of non-compliance with a condition of the monitoring program." Thus, if the tracking device stopped emitting signals in the middle of the night because it was not sufficiently charged or malfunctioned, a parole officer could enter the offender's residence without a warrant to determine the cause of the problem. Furthermore, if the parole officer sends the sex offender a text message, he must "comply with the instructions" contained in that message, presumably immediately.[4]
*200 In Smith, the Court observed that "[i]f the disability or restraint is minor and indirect, its effects are unlikely to be punitive." 538 U.S. at 100, 123 S.Ct. at 1151, 155 L.Ed.2d at 181. We do not believe that the physical discomfort that may result from being required to wear an ankle bracelet twenty-four hours a day, seven days a week, and the various ways in which that bracelet and the transmittal equipment may interfere with the daily life of a person required to wear it can fairly be described as "minor and indirect" and consequently nonpunitive. As the Supreme Judicial Court of Massachusetts observed in Cory, supra, 911 N.E.2d at 196, in concluding that retroactive application of a similar sex offender monitoring act violated the Ex Post Facto Clause:
There is no context other than punishment in which the State physically attaches an item to a person, without consent and also without consideration of individual circumstances, that must remain attached for a period of years and may not be tampered with or removed on penalty of imprisonment. Such an imposition is a serious, affirmative restraint.
Moreover, we do not believe that the requirements that a sex offender comply with any instructions given by his parole officer by text message and allow the parole officer immediate access to his residence at any time to investigate a report of noncompliance with the monitoring program can fairly be described, in the language of Smith, as allowing ex-offenders "to live and work as other citizens, with no supervision." 538 U.S. at 101, 123 S.Ct. at 1152, 155 L.Ed.2d at 182 (emphasis added). Therefore, we conclude that the GPS monitoring and supervision program conducted under the Sex Offender Monitoring Act subjects participants to multiple "affirmative disabilit[ies] [and] restraint[s]." Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661.
Moreover, those disabilities and restraints are similar to disabilities and restraints that have "historically been regarded as a punishment." Ibid. Parole or probation is considered a form of punishment that cannot be retroactively imposed or extended without violating the Ex Post Facto Clause of the United States Constitution. See, e.g., United States v. Dozier, 119 F.3d 239, 242-43 (3d Cir.1997); State v. Mendivil, 121 Ariz. 600, 592 P.2d 1256, 1258 (1979); State v. Lathrop, 781 N.W.2d 288, 298 (Iowa 2010); State v. Payan, 277 Neb. 663, 765 N.W.2d 192, 203 (2009), cert. denied, ___ U.S. ___, 130 S.Ct. 1708, 176 L.Ed.2d 195 (2010); Bowditch, supra, 700 S.E.2d at 8; State v. Metzler, 72 Or.App. 555, 696 P.2d 576, 577 (1985). Indeed, although the case did not involve the Ex Post Facto Clause, in Samson v. California, 547 U.S. 843, 850, 126 S.Ct. 2193, 2198, 165 L.Ed.2d 250, 258 (2006) (quoting United States v. Knights, 534 U.S. 112, 119, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 505 (2001)), the Court described parolees as being "on the `continuum' of state-imposed punishments." Similarly, in Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 3168-69, 97 L.Ed.2d 709, 718 (1987), the Court observed that "[p]robation is *201 simply one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."
Moreover, the Court implied in Smith that if the Megan's Law registration and notification requirements were found to be similar to conditions of probation or parole, this would support a conclusion that retroactive application of those requirements would violate the Ex Post Facto Clause. In rejecting the part of the court of appeals' decision that had found such similarity, the Court stated:
The Court of Appeals held that the registration system is parallel to probation or supervised release in terms of the restraint imposed. This argument has some force, but, after due consideration, we reject it. Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction. By contrast, offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision. [538 U.S. at 101, 123 S.Ct. at 1152, 155 L.Ed.2d at 182 (citations omitted).]
Unlike the registration and notification provisions of Megan's law involved in Smith, the monitoring and supervision conducted under the Sex Offender Monitoring Act involves a "series of mandatory conditions" that subject sex offenders to intense "supervision" to which other citizens are not subjected. Those conditionswhich include wearing an ankle-mounted GPS transmitter at all times; carrying a GPS tracking device on the offender's body whenever he leaves his residence; insuring that the device is fully charged on a daily basis; providing notice if the device becomes inoperable and paying for the cost of repair or replacement; immediately responding to any text message received via the tracking device and complying with any instructions given in the text message; providing the parole officer access to his residence for maintenance of the GPS equipment; providing the parole officer immediate access to his residence to investigate any reports of noncompliance with the monitoring program; providing the parole officer ten days written notice prior to any change in residence; providing the parole officer with notice prior to any travel out of state; and providing the parole officer with employment information, including the name, address and physical location of employment, any change in employment, and scheduled hours of work on a weekly basisare similar to standard conditions of probation and parole. See, e.g., N.J.S.A. 2C:45-1(b)(9), (10); N.J.A.C. 10A:71-6.4(a)(2), (15). Although an offender subject to the Sex Offender Monitoring Act is not required to comply with all the standard conditions of probation or parole, the typical probationer or parolee is not required to wear an ankle bracelet and comply with the other conditions of the GPS monitoring program,[5] which are more onerous *202 in some respects than the usual conditions of probation or parole. But whether the conditions are considered more or less onerous, the GPS monitoring program is sufficiently similar to probation or parole to support the conclusion that it imposes disabilities and restraints similar to disabilities and restraints that have "historically been regarded as a punishment." Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661.
The similarity between the requirements of the GPS monitoring program and the conditions of probation or parole that are considered punitive distinguishes this case from Hendricks, supra, 521 U.S. at 361-64, 117 S.Ct. at 2081-83, 138 L.Ed.2d at 514-16, which held that a statute providing for the civil commitment of sexually violent predators could be applied to persons convicted of sexually-related offenses before its enactment without violating the Ex Post Facto Clause because the purpose of the confinement was not punitive but rather "to restrict the freedom of the dangerously mentally ill." Id. at 363, 117 S.Ct. at 2083, 138 L.Ed.2d at 516. Thus, such confinement is similar to the involuntary civil commitment of other mentally ill persons in state institutions, rather than an extension of the term of imprisonment or other punishment for a crime, and "has been historically so regarded." Ibid. Indeed, a person could be civilly committed under the statute upheld in Hendricks even if he or she had been "absolved of criminal responsibility." Id. at 362, 117 S.Ct. at 2082, 138 L.Ed.2d at 515. Therefore, even though such civil commitment certainly involves an "affirmative disability or restraint," it is not one that has "historically been regarded as a punishment." Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661.
We conclude, for the reasons previously stated, that the substantial "affirmative disabilit[ies] [and] restraint[s]" the Sex Offender Monitoring Act imposes, and the fact that those disabilities and restraints are similar to disabilities and restraints that have "historically been regarded as a punishment," are sufficient, by themselves, to hold that the retroactive application of the Act violates the Ex Post Facto Clause. However, other Mendoza-Martinez factors provide additional support for this conclusion.
First, it is undisputed that the behavior to which the requirement of GPS monitoring applies, the commission of certain sexually-related crimes, is "already a crime." Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661. Although this factor may not be entitled to substantial weight, it provides some additional support for the conclusion that the application of the Sex Offender Monitoring Act to appellant violates the Ex Post Facto Clause. Second, the operation of the Act "promote[s] the traditional aims of punishmentretribution and deterrence," because it imposes onerous physical restrictions upon an offender required to participate in the program, which are designed to and undoubtedly would deter the commission of new crimes. Although such a deterrent effect does not make a statute punitive in effect if the disabilities or restraints it imposes are minor and indirect, see Smith, supra, 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d at 183, the additional disabilities and restraints imposed by the Sex Offender Monitoring Act are substantial and therefore punitive. This is particularly true of offenders such as appellant who have served their complete sentences and are not subject to any form of supervised release except for the *203 registration and notification provisions of Megan's Law. As the dissent noted in Bowditch, supra, 700 S.E.2d at 21:
The physical and practical realities of the [monitoring] programthe size and weight of the ankle bracelet and [tracking device], the requirement to remain in one place for six hours for daily recharging, the degree to which [monitoring] interferes with everyday work and recreation activities, the degree to which the program impedes enrollees' freedom of travel, and its invasive requirement for consent to enter an enrollee's hometransform the effect of the scheme from regulatory to punitive. This is particularly true for those enrollees who are "unsupervised," meaning that they have completed their prison sentences and any post-release supervision ordered by the court.
The Parole Board relies upon the Court's statement in Smith that "[t]he Act's rational connection to [the] nonpunitive purpose [of public safety] is a `most significant' factor in our determination that the statute's effects are not punitive," 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d at 183 (quoting United States v. Ursery, 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549, 569 (1996)), and suggests that this factor should be central in considering any claim that the retroactive application of a criminal statute violates the Ex Post Facto Clauses. However, the Court made this statement only after it had already concluded that the "disabilit[ies] and restraint[s]" imposed by the registration and notification provisions of Megan's Law were "minor and indirect," id. at 100, 123 S.Ct. at 1151, 155 L.Ed.2d at 181, and were not comparable to "probation or supervised release," id. at 101, 123 S.Ct. at 1152, 155 L.Ed.2d at 182, and thus had not historically been regarded as punishment. The Court did not say that a "rational connection to [the] nonpunitive purpose" of public safety would prevent retroactive application of a statute from being found to violate the Ex Post Facto Clause even if it imposes onerous restraints and disabilities that have historically been regarded as punishment. If this factor was treated as a dominant consideration in every case involving a claimed violation of the Ex Post Facto Clause, even a statute providing a longer term of imprisonment for certain sex offenders could be validly applied retroactively in the interests of "public safety." Therefore, we conclude that in this case, unlike in Smith, the controlling Mendoza-Martinez factors are that the Sex Offender Monitoring Act imposes "affirmative disabilit[ies] and restraint[s]" and that those disabilities and restraints are similar to probation and parole, which have "historically been regarded as a punishment." Mendoza-Martinez, supra, 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661.
Accordingly, we reverse the final decision of the Chairman of the Parole Board rejecting appellant's administrative appeal of the decision that he is subject to the Sex Offender Monitoring Act.
PARRILLO, P.J.A.D. (dissenting).
I find no ex-post facto or other constitutional prohibition in applying the Act's Global Positioning Satellite (GPS) anklet to appellant. As the majority correctly notes, the legislatively-prescribed consequences befalling appellant are not penal in either intent or design. Nor, in my view, are they "so punitive" in effect or impact as to override the Legislature's clearly stated regulatory and remedial purpose. Therefore, I dissent from the majority's contrary holding.
The fact that there may be some adverse impact"one that effects retribution or accomplishes deterrence"does not *204 necessarily or automatically render the law "punishment." Doe v. Poritz, 142 N.J. 1, 46, 662 A.2d 367 (1995); see also In re Civil Commitment of W.X.C., 204 N.J. 179, 190, 8 A.3d 174 (2010), cert. denied, ___ U.S. ___, 131 S.Ct. 1702, 179 L.Ed.2d 635 (2011). It is only where the sole explanation for that impact is a punitive intent that the law is characterized as punitive and therefore applied only prospectively. Poritz, supra, 142 N.J. at 46, 662 A.2d 367. If, however, the impact is simply an inevitable consequence of the regulatory provisions themselves, the law remains regulatory in accordance with the legislative intent. Ibid.
In considering whether a statute is penal or regulatory in effect, courts look to whether it: (1) involves an affirmative disability or restraint; (2) has historically been regarded as punishment; (3) comes into play only on a finding of scienter; (4) will promote the traditional aims of punishmentretribution and deterrence; (5) applies to behavior that is already a crime; (6) may be rationally connected to an alternative non-punitive purpose; and (7) appears excessive in relation to the alternative purpose assigned. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644, 661 (1963). These seven "factors are designed to apply in various constitutional contexts. . . [and] are neither exhaustive nor dispositive. . . but are useful guideposts" to determine if a regulatory or civil statute has a punitive effect when applied. Smith v. Doe, 538 U.S. 84, 97, 123 S.Ct. 1140, 1149, 155 L.Ed.2d 164, 179-80 (2003) (citations and internal quotation marks omitted).[1]
In applying the first Mendoza-Martinez factor, courts must "inquire how the effects of the Act are felt by those subject to it. If the disability or restraint is minor or indirect, its effects are unlikely to be punitive." Smith, supra, 538 U.S. at 99-100, 123 S.Ct. at 1151, 155 L.Ed.2d at 181.
In Smith, supra, the Supreme Court concluded that the Alaska sex offender registration and notification statute does not subject enrollees to an affirmative disability or restraint because it "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." Id. at 100, 123 S.Ct. at 1151, *205 155 L.Ed.2d at. 181. The Court rejected the contention that the periodic update requirement imposes an affirmative disability because the Act, on its face, does not require the updates to be made in person. Id. at 101, 123 S.Ct. at 1151, 155 L.Ed.2d at 182. In contrast to probationers and supervised releasees, offenders subject to the statute are "free to move where they wish and to live and work as other citizens, with no supervision." Ibid. While registrants must inform the authorities after they change their facial features, borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so. Ibid. Moreover, while a sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, any prosecution is a proceeding separate from the individual's original offense. Id. at 101-02, 123 S.Ct. at 1152, 155 L.Ed.2d at 182-83.
While admittedly the attachment of a GPS device to an individual is more physically burdensome than a yearly registration and notification requirement, in my view it does not rise to the level of a direct and punitive disability or restraint. It is certainly far less restrictive than post-incarceration involuntary confinement, which, as noted, has been upheld as non-punitive, Kansas v. Hendricks, 521 U.S. 346, 370-71, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501, 520 (1997), and far less harsh than other sanctions historically viewed as non-punitive, such as revocation of a professional license and other occupational disbarment. See Smith, supra, 538 U.S. at 100, 123 S.Ct. at 1151, 155 L.Ed.2d at 181. It is also, in a very real sense, far less intrusive, expansive and harsh than the consequences attending sex offenders under Megan's Law, including notification of neighbors about a sex offender's presence in their community and posting searchable online lists of at least some categories of registered sex offenders, effectively excluding them from a wider moral community and relegating them to a social quarantine of sorts. N.J.S.A. 2C:7-6 to -8; N.J.S.A. 2C:7-13. Simply put, the majority's constitutional tolerance of laws that register, publicize, monitor and indefinitely institutionalize sex offenders after completion of their criminal sentences cannot logically be reconciled with its avowed distaste for a rule requiring the most serious sex offenders, who remain free to live, work and walk wherever they please, to submit to a form of electronic surveillance.
In Doe v. Bredesen, 507 F.3d 998, 1000 (6th Cir.2007), reh'g en banc denied, 521 F.3d 680 (6th Cir.2008), cert. denied, 555 U.S. 921, 129 S.Ct. 287, 172 L.Ed.2d 210 (2008), the United States Court of Appeals for the Sixth Circuit concluded that the Tennessee Serious and Violent Sex Offender Monitoring Pilot Project Act, which "subject[s] a convicted sexual offender to a satellite-based monitoring [(SBM)] program for the duration of his probation," did not constitute an affirmative disability or restraint because its registration, reporting and surveillance components
do not increase the length of incarceration for covered sex offenders, nor do they prevent them from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation.
[Id. at 1005.]
In State v. Bare, 197 N.C.App. 461, 677 S.E.2d 518, 528 (2009), disc. review denied, 702 S.E.2d 492 (N.C.2010), the North Carolina Court of Appeals similarly concluded that wearing an electronic tracking device at all times and being required to cooperate with the Department of Corrections (DOC) to ensure the device is working properly does not impose a punitive restraint on the defendant's daily activities. *206 Under the North Carolina SBM program, the DOC may contact offenders for the limited purpose of enrollment in the program and maintenance of the SBM device. Ibid. Noting that the record and statute did not indicate how frequently the DOC would contact the offender or where the offender would be required to appear, the court concluded that the defendant had not shown that "cooperation with the [DOC] for the purposes of maintaining the SBM device is any more of an affirmative restraint than the registration requirements." Id. at 529.
Reaching the same conclusion, the North Carolina Supreme Court upheld the constitutionality of that State's SBM program against state and federal ex post facto challenges. State v. Bowditch, 364 N.C. 335, 700 S.E.2d 1 (2010). In doing so, the court reasoned, in part, that the requirement that DOC personnel be allowed to enter a participant's residence every ninety days is neither supervisory nor investigatory, but only for the purpose of performing regularly scheduled maintenance on the SBM equipment, which is still property of the State, to ensure its proper operation. Id. at 9. Responding to the defendant's other argument that charging the miniature tracking device (MTD) for six hours every twenty-four hour period constitutes an affirmative physical restraint as it ties the participant for the charged period to the location of the base unit, the court simply noted that the "MTD's battery can be charged wherever electricity is available." Ibid. And while the SBM program also requires participants to acknowledge messages sent via the MTD and cooperate with the DOC in resolving alerts, these requirements, "necessary to operate SBM[,] `make a valid regulatory program effective and do not impose punitive restraints.'" Id. at 11 (quoting Smith, supra, 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d at 183). See also Hassett v. State, 12 A.3d 1154 (Del. 2011).
The Supreme Judicial Court of Massachusetts reached a different result in Commonwealth v. Cory, 454 Mass. 559, 911 N.E.2d 187 (2009). However, there, the court found that the text and structure of the Massachusetts statute, which applied to every defendant sentenced to probation for certain sex offenses without regard to current dangerousness, suggested a penal intent. Id. at 193. Here, as even the majority admits, the Act evinces no such punitive purpose. To be sure, the court in Cory, consistent with its finding of a punitive legislative intent, also determined that the GPS monitoring at issue there imposed a significant burden on an individual's liberty.
The intended function of the GPS device, continuous reporting of the offender's location to the probation department, also represents an affirmative burden on liberty. While GPS monitoring does not rise to the same level of intrusive regulation that having a personal guard constantly and physically present would impose, it is certainly far greater than that associated with traditional monitoring. And the impact of such intrusion is of course heightened by the physical attachment of the GPS bracelet, which serves as a continual reminder of the State's oversight.
[Id. at 196-97 (footnote omitted).]
Significant for present purposes, however, the Massachusetts legislation delineated specific geographic exclusionary zones that the offender was prohibited from entering, and violation of the terms of the GPS monitoring program could result in termination of probation or another punitive sanction if probable cause existed. Id. at 190-91.
*207 In marked contrast, the GPS device at issue here does not physically restrain movement or impinge on travel. The Act imposes no time or place restrictions, no curfew or home detention, and no out-of-state limitations. There is no detainment or random searches. Unlike the Massachusetts GPS statute, the Act does not delineate, on the one hand, exclusionary zones from which the participant must refrain from visiting or, on the other hand, inclusionary zones where he must remain for a fixed period of time. Rather, the individual offender is free to move about at will with no constraints other than to carry the transmitter, which is the size of a cell phone. He is also at liberty to live and work wherever he pleases and the Act's only requirement in this regard is the provision of home and work addresses, as well as notification of any changes thereto or out-of-state travel. Permission or approval is not required. Moreover, the GPS anklet monitors only the offender's geographic location, not his specific activities. In this regard, the surveillance components of the GPS system operate rather passively to periodically track movement and whereabouts for discernible patterns or proximity to sensitive locations such as schools or day-care centers.
The only so-called "burden" is wearing the anklet and charging the GPS tracking device for two hours out of every sixteen. While not trivial interferences, these requirements, necessary for effective operation of the program, do not rise to the level of an affirmative restraint or disability, do not remotely approximate the far more onerous effects of the regulations found non-punitive in occupational disbarment and civil confinement schemes, and are merely a consequence of a regulatory routine designed for the public's protection.
The majority finds the program's conditions comparable to probation and parole, which are considered a "form of punishment that cannot be retroactively imposed or extended without violating the Ex Post Facto Clause." See supra at 241, 32 A.3d at 200. However, parole and probation are primarily rehabilitative in purpose, Morrissey v. Brewer, 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484, 492 (1972); State v. Black, 153 N.J. 438, 447, 710 A.2d 428 (1998), intended to serve the overall public interest as well as the good of the offender, In re Buehrer, 50 N.J. 501, 509, 236 A.2d 592 (1967), which indicates more of a civil than a criminal orientation.
I do not mean to suggest that a statute imposing a mandatory period of probation or lifetime community supervision for a crime could be applied retroactively. However, the GPS monitoring program at issue here is sufficiently distinguishable from probation, parole or supervised release so as not to come within the constitutional ex post facto proscription. For instance, under N.J.S.A. 30:4-123.59b(1), a parolee shall agree to abide by specific conditions deemed reasonable in order to reduce the likelihood of criminal or delinquent behavior. Similarly, when sentencing an offender to probation, a court shall attach such reasonable conditions as necessary to ensure that the probationer will lead a law-abiding life. N.J.S.A. 2C:45-1a. Standard conditions may include, but are not limited to, obtaining permission to change residence or employment, reporting to a parole/probation officer, making restitution, complying with restrictions on Internet access and gun possession, undergoing medical or psychiatric treatment, participating in rehabilitation programs, and performing community service. N.J.S.A. 30:4-123.59b; N.J.S.A. 2C:45-1b. Probationers and parolees are also generally subject to curfews and travel restrictions, and may be prohibited from visiting certain locations and associating with certain individuals. Ibid.
*208 In contrast, appellant is burdened by none of these limitations under the Act. As noted, he is free to live, work, travel and associate as he wishes. He is under no regular physical reporting obligation or requirement to attend any remedial program. He does not live under a regime of "conditional liberty properly dependent on observance of special restrictions," Morrissey, supra, 408 U.S. at 480, 92 S.Ct. at 2600, 33 L.Ed.2d at 494, a violation of which may result in revocation of probation or parole. And, although appellant is continuously monitored, the surveillance components of the GPS program are more passive than the active supervision attending probationers and parolees and "are not of a type that we have traditionally considered as a punishment." Bredesen, supra, 507 F.3d at 1005.
Unlike the majority, I see nothing excessivemuch less "so punitive" as to override the Legislature's regulatory intent in requiring appellant to acknowledge text messages, cooperate to resolve suspected program violations, or allow DOC personnel to perform routine maintenance on the GPS equipment. Moreover, whatever adverse effects the majority hypothecates in the way of physical discomfort and interference with daily activities are, in my view, slight and pale in comparison with the restraints that could be imposed on probationers and parolees. But even if the supposed impacts are more real than speculative, the majority does not allow for the possibility of making accommodations according to the special or unique needs of the GPS participants. Simply put, I find that more parallels exist between the GPS program at issue and the regulatory schemes analyzed and upheld in Smith and Hendricks than the standard probation and parole scenarios relied upon by the majority.
The next Mendoza-Martinez factors are related and ask us to determine whether the GPS program has a rational connection to a non-punitive purpose and, if so, whether the GPS program is excessive with respect to its non-punitive purpose. The excessiveness inquiry of ex post facto jurisprudence "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy," but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Smith, supra, 538 U.S. at 105, 123 S.Ct. at 1154, 155 L.Ed.2d at 185.
On this score, appellant contends that the Act lacks the necessary regulatory connection because it does not prevent offenders from re-offending. This argument, however, was soundly rejected in Bredesen, supra, wherein the Sixth Circuit noted:
First, as even the dissent itself recognizes, the monitoring system has a deterrent effect on would-be re-offenders. Second, the ability to constantly monitor an offender's location allows law enforcement to ensure that the offender does not enter a school zone, playground, or similar prohibited locale.
[507 F.3d at 1007.]
The Bare court similarly found that the SBM provisions of the North Carolina statute were reasonably related to their regulatory purpose of protecting the public from offenders with an undisputed high risk of recidivism. As the court noted:
The ability to track the location of individuals who have committed sex offenses against minors or other aggravated sex offenses has a rational connection to the purpose of protecting the public.
[Bare, supra, 677 S.E.2d at 530.]
Unquestionably, there is a rational relationship between New Jersey's GPS program and the non-punitive purpose of *209 protecting the public, given the widely-documented and well-established risk of recidivism posed by convicted sex offenders. See Poritz, supra, 142 N.J. at 15-16, 662 A.2d 367.
Contrary to appellant's contention, the Act's "sanction" is not excessive in relation to its non-punitive objective merely because its duration is lifelong. In Bare, supra, the court noted that the defendant could eventually request termination of the SBM if he remained offense-free. 677 S.E.2d at 530. Likewise here, a Tier III offender subject to GPS monitoring who has been offense-free for fifteen years may apply to terminate the registration obligations pursuant to N.J.S.A. 2C:7-2f. If successful and no longer classified a Tier III offender, the basis for imposing the sanctions, and the sanction itself, cease to exist.
In any event, the length of time the offender is subject to the Act is reasonably related to the risk of recidivism and therefore is consistent with the regulatory objective. Pertinent thereto, the Court in Smith, supra, noted:
Empirical research on child molesters, for instance, has shown that, "contrary to conventional wisdom, most reoffenses do not occur within the first several years after release," but may occur "as late as 20 years following release." R. Prentky, R. Knight, and A. Lee, U.S. Dept. of Justice, National Institute of Justice, Child Sexual Molestation: Research Issues 14 (1997).
[538 U.S. at 104, 123 S.Ct. at 1153, 155 L.Ed.2d at 184.]
Moreover, the reasonableness of New Jersey's GPS program is supported by its limited application. Unlike the Act, the Massachusetts GPS statute found excessive and therefore struck down as violative of the ex post facto clause in Cory, supra, applied uniformly and without exception to all convicted sex offenders sentenced to probationary terms "regardless of any individualized determination of their dangerousness or risk of reoffense." 911 N.E.2d at 197. The Massachusetts legislation provided that "[a]ny person who is placed on probation for any offense listed within the definition of `sex offense,' a `sex offense involving a child' or a `sexually violent offense' . . . shall, as a requirement of any term of probation, wear a global positioning system device." Id. at 190.
In contradistinction, in North Carolina, the SBM conditions "are not imposed on all sex offenders, but only those whom the legislature has designated as posing a particular risk." Bare, supra, 677 S.E.2d at 530. In Tennessee, the GPS conditions apply only to violent sexual offenders. Bredesen, supra, 507 F.3d at 1001.
Similarly, here, the Act does not apply to all sex offenders but only to those found to have a high risk of reoffense by virtue of their Tier III classification and found by the chairman of the Parole Board to be appropriate for such monitoring who meet any of these criteria: 1) was subject to civil commitment as a "sexually violent predator"; 2) has been sentenced to a term of community or parole supervision for life; or 3) "has been convicted of . . . a sex offense enumerated in [N.J.S.A. 2C:7-2b] and the victim of the offense was under 18 years of age. . . ." N.J.S.A. 30:4-123.91a. For those qualifying in either category, there first has been a particularized determination based on a consideration of the individual's circumstances. N.J.S.A. 30:4-123.91b. Just as important, eligibility is determined not solely upon the offender's past criminal conduct, but by his current level of dangerousness. N.J.S.A. 30:4-123.91a(1). In the present instance, appellant was individually assessed on July 16, 2009, when the court determined, after appropriate notice and a hearing, that he *210 should be classified as a Tier III offender based on his present dangerousness. Thus, forsaking the automatic mandatory trigger of the Massachusetts statute in favor of individualized adjudication, the Act is appropriately tailored and reasonably related to its non-punitive purposes and not excessive in its application.
The next Mendoza-Martinez factors ask us to determine whether GPS monitoring is of the type we have historically considered as punishment, and whether it is intended to promote the conventional aims of punishment, namely retribution and deterrence. In this regard, appellant compares the anklet to a modern day Scarlet Letter, exposing the wearer to public ridicule and disgrace. The comparison is unsound.[2]
Simply put, this technologically advanced method of tracking sex offenders has no historical antecedent. Nor does the GPS program share any of the defining attributes associated with traditional penal measures. The stated objective of the anklet is not to publicize crime or stigmatize the offender, but rather to facilitate the public safety goals of detection and deterrence by tracking the location of those whom the Legislature has identified as the most dangerous sex offenders or posing a high risk of recidivism. Indeed, nothing in the Act or Administrative Code requires an offender to wear the device in plain view. Unlike historical forms of "shaming," the device need not be visiblemuch less conspicuousas it can be covered or concealed by clothing. Moreover, even if visibly worn, the ankle transmitter does not necessarily suggest that the wearer is a sex offender. As the court in Bredesen, supra, noted, "[t]hese devices can be utilized in a variety of contexts, such as pretrial monitoring and work release, and are, in fact, advertised for use in such situations." 507 F.3d at 1005. Should some members of the public see this device at all and visit retribution on the offender, the fact remains that retribution is not the purpose of the Act. In terms of public dissemination, there is no dispositive difference between, on the one hand, wearing the anklet and, on the other hand, posting sex offender information on the Internet, which the United States Supreme Court does not consider punitive. Smith, supra, 538 U.S. at 91, 97-99, 123 S.Ct. at 1146, 1149-50, 155 L.Ed.2d at 175-76, 179-81. In any event, appellant has not demonstrated that wearing the anklet has resulted in expulsion, social ostracism or loss of employment opportunity.
Finally, although arguably the device may have some deterrent effect in that sex offenders may be less likely to reoffend knowing their location would be tracked, presumably the actual threat of long-term incarceration is a far greater deterrent. In any event, the mere prospect of deterrence does not render the Act punitive for purposes of the ex post facto clause, "as deterrence may serve civil as well as criminal goals." Hudson v. United States, 522 U.S. 93, 105, 118 S.Ct. 488, 496, 139 L.Ed.2d 450, 463 (1997) (citations and internal quotation marks omitted). Indeed, any potential for deterrence is simply an unavoidable consequence of the Act's remedial and regulatory provisions.
*211 In sum, application of the relevant Mendoza-Martinez factors in this instance plainly demonstrates that the monitoring restrictions imposed by the Act do not negate the Legislature's clearly expressed intent to create a civil regulatory scheme. Appellant has failed to show that the Act's effects are sufficiently punitive to transform its civil remedy into criminal punishment. As such, I conclude, using the same analysis for both claims, see Poritz, supra, 142 N.J. at 42 n. 10, 662 A.2d 367, that retroactive application of the Act's provisions to appellant and others similarly situated does not violate the ex post facto prohibition in the New Jersey and United States Constitutions.[3]
NOTES
[1] U.S. Const. art. I, § 9, cl. 3; U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, par. 3. Section 9, Clause 3 of the United States Constitution applies to Congress, and Section 10, Clause 1, applies to the states. The references in this opinion to the Ex Post Facto Clause of the United States Constitution are to Section 10, Clause 1.
[2] A ruling that the Sex Offender Monitoring Act, as currently administered, is invalid because the details of the program have not been adopted as administrative rules would apply not only to offenders such as appellant who committed a specified sexual offense before the Act's enactment but also to offenders who committed such offenses after the Act's effective date.
[3] In Poritz, supra, 142 N.J. at 63-73, 662 A.2d 367, our Supreme Court held that the Mendoza-Martinez factors should not be applied in determining whether retroactive application of the registration and notification provisions of Megan's Law violate the Ex Post Facto Clauses. However, this part of Poritz was rejected in Smith, which upheld retroactive application of the registration and notification provisions of Alaska's Megan's Law based on the Mendoza-Martinez factors. Therefore, the Mendoza-Martinez factors must be applied in determining whether the Sex Offender Monitoring Act violates the Ex Post Facto Clause of the United States Constitution.

In Poritz, 142 N.J. at 42-43, 662 A.2d 367, our Supreme Court indicated that it would follow the Supreme Court of the United States' interpretation of the Ex Post Facto Clause of the United States Constitution in interpreting the Ex Post Facto Clause of the New Jersey Constitution. Consequently, we assume our Supreme Court would now apply the Mendoza-Martinez factors in interpreting the New Jersey Constitution's Ex Post Facto Clause. In any event, even if there were a basis for concluding that our Supreme Court would not apply the Mendoza-Martinez factors in interpreting the Ex Post Facto Clause of the New Jersey Constitution, retroactive application of the Sex Offender Monitoring Act would violate the Ex Post Facto Clause of the United States Constitution for the reasons set forth in the following discussion.
[4] We note that although this appeal comes before us without the benefit of the full factual record that would be provided by a trial, the trial court in State v. Bowditch, 364 N.C. 335, 700 S.E.2d 1 (N.C.2010), made detailed factual findings concerning other adverse effects upon a person required to wear a monitoring bracelet attached to his ankle, such as that he cannot go swimming or sit in a hot tub, and if he requires whirlpool therapy, a probation officer must remove the bracelet and reattach it after the therapy is complete. Moreover, a person wearing such an ankle bracelet cannot fly on a commercial airline, because the transmitter cannot pass security, and would have difficulty working or engaging in recreational activities in certain types of buildings, because of technological complexities of the transmittal equipment. Although these factual findings were quoted in the dissent in Bowditch, id. at 16-17, they are also recited in summary form in the majority opinion, id. at 4-5, and were not contested by the State, see id. at 16. There is no reason to believe that the monitoring equipment used in this State is different from the equipment involved in Bowditch.
[5] Our understanding is that probationers and parolees are sometimes required to wear the same kind of ankle bracelets and be subject to the same GPS monitoring as offenders subject to the Sex Offender Monitoring Act, but that this is a relatively unusual condition of probation or parole. Moreover, the fact that even before enactment of the Act, a trial court, in the exercise of its discretion, could have subjected a probationer or parolee to GPS monitoring similar to what the Act now mandates for specified sex offenders does not affect the analysis under the Ex Post Facto Clause. See Lindsey v. Washington, 301 U.S. 397, 399-402, 57 S.Ct. 797, 798-99, 81 L.Ed. 1182, 1185-86 (1937) (holding that the retroactive application of a law that removes discretion from the trial court in sentencing violates the Ex Post Facto Clause); see also Miller, supra, 482 U.S. at 432-33, 107 S.Ct. at 2452, 96 L.Ed.2d at 361-62. In any event, appellant is not now subject to probation or parole.
[1] The third and fifth factorswhether the Act applies only upon a finding of scienter and whether the conduct to which the Act applies was already a crimedo not alter the analysis of whether the effects of the GPS monitoring program are so punitive as to negate the statute's civil, regulatory intent. See Smith, supra, 538 U.S. at 105, 123 S.Ct. at 1154, 155 L.Ed.2d at 185 (deeming the third and fifth Mendoza-Martinez factors "of little weight" to the case); Doe v. Bredesen, 507 F.3d 998, 1007 (6th Cir.2007) (noting that these two Mendoza-Martinez factors are "not particularly germane" when testing sex offender registration and global monitoring statutes for ex post facto concerns), reh'g en banc denied, 521 F.3d 680 (6th Cir.2008), cert. denied, 555 U.S. 921, 129 S.Ct. 287, 172 L.Ed.2d 210 (2008).

The majority, however, attributes some weight to the fifth factor. This factor considers whether the sanction is administered as a criminal penalty that is in response to criminal conduct. Although triggered by a past crime, the Act does not create culpability for prior criminal conduct, but rather targets recidivist tendencies evidenced by a finding of present dangerousness. Smith, supra, 538 U.S. at 105, 123 S.Ct. at 1154, 155 L.Ed.2d at 185. In fact, here, following a hearing on July 16, 2009, the Law Division determined that appellant is presently a Tier III Megan's Law offender with a high risk of reoffense, based in part upon his final score of 92 on the Registrant Risk Assessment Scale (RRAS) and upon a full review of each factor of the RRAS.
In any event, the fact that the Act applies only to individuals convicted of prior criminal sexual conduct is consistent with its regulatory purpose and not indicative of a retributive nature. That a statute may be applied to criminal activity is insufficient to render it punitive or penal.
[2] In Bredesen, supra, the court noted that the ankle transmitter at issue was relatively small and not dissimilar to other electronic devices such as a walkie-talkie or personal organizer. 507 F.3d at 1005. More importantly, no evidence was presented to suggest that an observer would recognize the device as one that monitored sex offenders specifically. Ibid. The Bare court similarly noted that the defendant presented no evidence demonstrating that the device is recognizable as a monitor assigned to sex offenders. Bare, supra, 677 S.E.2d at 528.
[3] Because appellant's claim under the ex post facto clause fails, his claim under the federal and state double jeopardy provisions fails as well, Hendricks, supra, 521 U.S. at 369, 117 S.Ct. at 2086, 138 L.Ed.2d at 519-20, since the threshold question is the same in both namely, whether the sanction constitutes a "criminal punishment." Auge v. N.J. Dep't of Corr., 327 NJ.Super. 256, 262, 743 A.2d 315 (App.Div.), certif. denied, 164 N.J. 559, 753 A.2d 1152 (2000).

Lastly, I find no merit in appellant's void for vagueness and due process arguments. R. 2:11-3(e)(2). Suffice it to say, the Act provides clear notice and warning that sex offenders who fall within one or more of the expressly defined statutory categories may be subject to the GPS monitoring program, and that once so identified, further provides the requisite due process protections before any such determination is made.