Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/03/2017 09:08 AM CST

State of Nebraska, appellee, v.
Brian D. Smith, appellant.
___ N.W.2d ___

Filed March 3, 2017.    No. S-16-199.

1. **Breach of Contract: Plea Bargains.** When the facts are undisputed, the question of whether there has been a breach of a plea agreement is a question of law.

2. **Constitutional Law: Sentences: Words and Phrases: Appeal and Error.** Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law. When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.

3. **Sentences: Appeal and Error.** A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result.

4. **Plea Bargains: Specific Performance: Pleas.** When the State breaches a plea agreement, the defendant generally has the option of either having the agreement specifically enforced or withdrawing his or her plea.

5. **Courts: Plea Bargains.** Courts enforce only those terms and conditions about which the parties to a plea agreement did in fact agree.

6. **Sentences: Statutes: Time.** The good time law in effect at the time a defendant's convictions become final is the law that is to be applied to the defendant's sentences.

7. **Convictions: Sentences: Final Orders: Time: Appeal and Error.** A defendant's convictions and sentences become final on the date that the appellate court enters its mandate concerning the defendant's appeal.

8. **Constitutional Law: Sentences: Statutes: Time.** When a defendant's original sentence has been vacated for being unconstitutional and void, the good time law to be applied to the defendant's new sentence is the law in effect at the time that sentence becomes final.

9. **Constitutional Law: States: Minors: Convictions: Sentences: Homicide: Probation and Parole.** It is unconstitutional for a state to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense.
10. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
11. **Sentences.** In determining the sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed.

Jeffery A. Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Kelch, J.

## I. NATURE OF CASE

In 1983, Brian D. Smith pled guilty to kidnapping, a Class IA felony—a crime Smith committed when he was 16 years old. Smith's sentence of life imprisonment was later vacated, and he was resentenced to 90 years' to life imprisonment. Smith appeals this sentence, alleging that it is excessive and violates the 8th and 14th Amendments to the U.S. Constitution and the principles set forth in the U.S. Supreme Court case *Graham v. Florida*.[1]

---

[1] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

## II. FACTS

### 1. Overview

Smith was 16 years old when he pled guilty to the crimes of burglary and kidnapping. In exchange for Smith's pleas, the State dismissed charges of robbery, first degree sexual assault, and felony murder. Smith's crime of kidnapping was a Class IA felony because the kidnapping victim was not voluntarily released or liberated alive and in a safe place without having suffered serious bodily injury. In fact, the victim was later found dead. For the burglary, Smith was sentenced to 5 to 20 years' imprisonment. For the kidnapping, the court imposed a concurrent sentence of life imprisonment. Smith's codefendant, Dale Nollen, pled guilty to first degree murder and was also sentenced to life imprisonment.

In 2010, the U.S. Supreme Court decided *Graham*,[2] in which it held that the Eighth Amendment prohibits the imposition of life imprisonment without parole upon juvenile offenders who have not committed homicide. In 2012, in *Miller v. Alabama*,[3] the Supreme Court held that the Eighth Amendment prohibits mandatory life imprisonment without parole for juvenile offenders.

In 2015, Smith filed an application for a writ of habeas corpus in Lancaster County District Court. After an evidentiary hearing, the district court determined that Smith was entitled to relief under *Graham* and vacated Smith's life sentence. Smith's case was remanded to the Washington County District Court, where he was resentenced to 90 years' to life imprisonment. From that sentence, Smith appeals.

### 2. Resentencing Hearing

At the resentencing hearing, Smith's counsel argued that Smith should receive a lenient sentence because of his immaturity, vulnerability, and lack of true depravity at the time

---

[2] *Id.*

[3] *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

of the crime. Smith offered and the court received several exhibits, including (a) Nollen's application to the Board of Pardons, containing Nollen's statement about what happened on January 11, 1983; (b) Smith's 1983 presentence report, which contains Smith's statement about what happened on January 11, 1983; (c) a psychological evaluation of Smith conducted in 1983; (d) a psychological evaluation of Smith conducted in 2015; (e) Smith's misconduct and progress reports from the Nebraska Department of Correctional Services and the Missouri Department of Corrections; (f) amici briefs submitted in U.S. Supreme Court cases; and (g) a transcript of a deposition of Dr. Kayla Pope. We discuss the relevant portions of each exhibit before discussing the disposition of the case.

### (a) Nollen's Statement

In 2007, Nollen submitted an application for commutation to the Board of Pardons in which he described his "story of the crime."

In the application, Nollen confessed that it was his idea to rob a doughnut shop in Blair, Nebraska. He had worked there previously and needed $50 to pay his portion of a gas bill. When Nollen had worked there, the money from each day's sales was left in the store overnight and deposited the next morning by the owner. Nollen explained in the application, "[A]ll I would have to do is go in the back door, go down stairs to the basement and wait until everyone left. Then, go upstairs, get the money and leave." Nollen told Smith about the plan and asked Smith if he wanted to go with him. Nollen wrote, "[Smith] said he liked the idea and did want to go."

At around 3 p.m. on January 11, 1983, Smith and Nollen went into the doughnut shop to see who was working. It was 21-year-old Mary Jo Hovendick (Mary Jo). After Smith and Nollen talked to Mary Jo briefly, they left the doughnut shop through the front door, walked around to the back alley, through a back door of the doughnut shop, and into the basement of the shop.

Smith and Nollen waited in the basement. According to Nollen, he and Smith "smoked a couple bowls of pot and talked about how pretty Mary Jo is and what a nice body she has." Nollen made a comment "about the only way [they] would have a chance with her would be to take it." According to Nollen, Smith asked him if he wanted to, and Nollen laughed and said "okay." Nollen said that they got up and walked toward the stairs and that Nollen then stopped and said, "[F]___ that, if we did that we would have to kill her so she wouldn't tell on us." Smith and Nollen went back and sat down again.

Nollen wrote that he and Smith did not talk much for the next hour or so. During that time, Nollen was thinking about how pretty Mary Jo was and "how nice it would be to have sex with her." Nollen knew Mary Jo from school. Nollen wrote, "She had the reputation of being really quiet, shy - a loner but popular. She never had a boyfriend, so I was thinking if I had sex with her and messed up, she would never know because she has never been with anyone." Nollen "fell asleep thinking about [Mary Jo]," and Smith woke him up about an hour later.

Because neither Smith nor Nollen had a watch, neither one knew how long they had been waiting. Without knowing what time it was, they walked upstairs to see if they could hear anything. Nollen said they knew the store was closed because Mary Jo was in the office. They could hear her counting the money. Nollen told Smith that she was getting the money ready for deposit, which meant that she would take it to the bank and there would be only $20 left in the register (instead of about $200). Nollen wrote, "I asked [Smith] what he wanted to do. He said let's get it all."

According to Nollen, they went over to the office door. Smith then ran to the stairs and hid, and Nollen waited by the office door. After Mary Jo saw Nollen, he walked up to her and put his hand over her mouth so she would not scream. Nollen took her out to the hallway and instructed Smith to go and get the money. Smith got the money and put it in his pockets.

Nollen asked Mary Jo about her car, and she told him where it was. Nollen told Smith that he was going to get the car and that when Nollen honked the horn, Smith was to come out with Mary Jo. Smith complied. After the two of them got into the car with Nollen, he drove off. They stopped at a gas station, and Smith got out and put gas in the car, then went in and paid for it. After they left the gas station, Smith said he wanted to drive, so Smith and Nollen changed places. Smith drove around country roads while Nollen went through Mary Jo's purse, took $20 and gave it to Smith, then threw her purse out the window.

According to Nollen, Mary Jo had been sitting on the center console, so Nollen told her she could sit on his lap and pulled her toward him. Mary Jo slid over and sat on one of Nollen's legs. Nollen started thinking about having sex with Mary Jo again. He wrote, "It was really intense now, because I could smell her perfume and feel how soft her skin is." Nollen told Smith to pull over, and he did. Nollen forced Mary Jo into the back seat and climbed back there with her. He told Mary Jo to take her clothes off. Nollen tried to penetrate her with his penis, but was unsuccessful because Mary Jo kept pushing him away. Nollen said, "I was mad because I was not getting what I wanted, so I rubbed against her until I got off." He then asked Smith "if he wanted to come back," and Smith said that he did. The two switched places. Nollen could hear Smith telling Mary Jo to kiss him, and then Nollen "turned the radio up and started to figure out how [they] were going to get out of this." Nollen wrote that he "knew that the only way would be to kill Mary Jo but, [he] did not know how it would happen."

Eventually, Smith and Nollen traded places again and Smith drove the car back toward Blair. Nollen told Mary Jo to get dressed, and he tied her hands up with a ribbon that had been around her neck. Nollen then got back in the front seat of the car. Smith drove the car through Blair to a trailer park "by the river."

Smith and Nollen got out of the car and looked around. Nollen wrote, "We did not talk but, I think we both knew what was going to happen. I look at the bridge and thought we could throw her over the side. So I told [Smith] that when we get half way [sic] over the bridge to stop, he said okay . . . ." When the car got halfway across the bridge, Nollen got scared and worried that someone might see, so he told Smith to keep driving. Smith drove across the bridge and turned to go underneath it. They pulled up to the second dock by the river. Nollen got out of the car, and Smith followed.

Nollen wrote, "I figured, I would kill her by stabbing her [with a knife taken from the doughnut shop]. I asked [Smith] for the knife, he reached into the car and got it." Nollen pulled the passenger seat forward and looked at Mary Jo. When Nollen brought the knife toward Mary Jo, she screamed and started crying. Nollen said he looked at her and told her he was sorry. She kept crying, and Nollen threw the knife into the river and told her, "'[S]ee, I [sic] not going to hurt you.'" According to Nollen, after he told Smith that he "can not do this," "[Smith] shrugged and leaned into the car." Nollen wrote, "The car jumped forward and I jumped back. The car rolled down the dock into the river. I seen the car hit the water and I just stood there. . . . The car was still floating in the water when we left."

(b) Smith's Statement

In 1983, Smith was interviewed by a probation officer about the events that led to his kidnapping and burglary convictions. This interview was submitted as part of Smith's presentence report, which was admitted into evidence.

In the interview, Smith told the probation officer that when he agreed to rob the doughnut shop with Nollen, he thought they were just going to go in and get the money after the shop closed. His story was similar to Nollen's, but with some differences. Smith did not mention anything about smoking marijuana in the basement. Also, as to Smith's sexual assault of Mary Jo, Smith told the probation officer that Nollen asked

Smith if he wanted to get into the back of the car and that Smith said, "I guess so." Smith said he "got into the back and started to rape her, but decided [he] couldn't do it."

According to Smith, it was Nollen who drove the car across the bridge to the Iowa side. Smith also said that at the time the car was parked at the dock, he and Smith had not discussed what to do with Mary Jo. At that time, Nollen got into the back seat and tied Mary Jo's hands behind her back. Next, Nollen started to roll the passenger's side window down halfway and told Smith to do the same thing to the driver's side window. Smith complied. According to Smith, Nollen told Smith to put the car in gear, and Smith complied. Nollen then aided the car into the river by pushing on it.

### (c) 1983 Psychological Evaluation

About 1 month after Smith began serving his sentences, the Nebraska Department of Correctional Services conducted a psychological evaluation of Smith. During an interview for the evaluation, Smith again denied sexually assaulting Mary Jo. Smith's evaluator wrote:

> Smith tends to be an impressionable individual and strikes this examiner as more of a follower than a leader. One gets the impression that his co-defendant tended to be the more dominant party in the relationship, and this seems to be true when one tries to visually reconstruct the events for which . . . Smith is currently incarcerated.

The evaluator also wrote:

> [Smith] has little insight into the seriousness of his current offense. He is fairly overwhelmed by the prison environment and the length of his sentence. He is seen as having an elevated potential for violence based on testing. He may be susceptible to pressuring and negative peer influences.

### (d) 2015 Psychological Evaluation

For purposes of the resentencing hearing, Smith's counsel referred Smith to Dr. Matthew Huss for a current

psychological evaluation. Among other things, Dr. Huss evaluated Smith's social, educational, and occupational history. Dr. Huss also evaluated Smith's history of drug and alcohol use and assessed Smith's risk for general violence and sexual violence. The evidence set forth in Dr. Huss' evaluation is summarized below.

### (i) Social History

As a child, Smith lived mostly with his mother, his older sister, and two older brothers. From ages 9 to 12, Smith also lived with his stepfather and stepsiblings. Smith, Smith's sister, and Smith's mother all described life with the stepfather as a difficult time. The stepfather was apparently very possessive and controlling of Smith's mother, and he favored his own children over his stepchildren. Smith's sister explained to Dr. Huss that because of the stepfather, all of the older siblings moved out as soon as they were able; Smith's sister got married at age 16, and one brother enrolled in the Navy at age 17. Dr. Huss noted that Smith now has a good relationship with his family.

Smith reported that as he was growing up, he generally got along with other children and had friends as well as girlfriends. His mother stated that Smith "'was a magnet for older girls'" and was able to make friends without problems. At some point, Smith got married but divorced within a year. He admitted to an ongoing relationship with a woman he met in his childhood and that he would like to marry her if he were released from prison. However, he has told her to "live her life without him because of his sentence[s]" and is not naive that she will eventually move on one day.

Smith denied any history of physical abuse as a child, but admitted to being sexually abused as a child and to being sexually assaulted while in prison by a cellmate. When Smith was in the fourth or fifth grade, his high-school-age stepbrother sexually assaulted him about six times. Smith said that in the 1990's, he was sexually assaulted by a cellmate, but was able to transfer cells in order to stop the assaults. Smith also stated

that when he was in the seventh grade, his stepgrandfather had tried to grope him, but Smith rejected his advances and the assault did not escalate.

### (ii) Educational and
### Occupational History

Smith reported that he disliked school. He stated that he was placed in "'learning disabled classes,'" which only made him like school less. Smith started skipping school in the fourth grade, about one or two times per month. Although Smith was suspended one time for getting caught smoking cigarettes, Smith denied ever getting into serious trouble at school. Smith completed the 10th grade and attended a few weeks of 11th grade before dropping out.

After Smith completed the 10th grade, he performed a variety of jobs. He worked for a local trash company, filling in whenever they called him. Smith "performed several lawn care jobs, painted and worked in the bean fields." Smith's mother stated that it was difficult for him to find work when he was 16 years old "because the college kids in town would normally get the jobs teenagers could get."

Smith stated that he "'always had a job'" while incarcerated. Smith admitted that before he got sober, he would frequently lose jobs for smoking marijuana. After Smith was transferred to Missouri, he worked in a carpentry shop. Smith also became involved as a trainer in the "Puppies for Parole" program, which allows offenders to train dogs and make them more adoptable at local shelters. According to the records of the Missouri Department of Corrections, Smith's position training dogs is "an elite position (but with very little pay)" that requires offenders "to maintain exceptional behavior and attitude in order to remain a trainer."

### (iii) History of Drug
### and Alcohol Use

Smith reported that he first used alcohol when he was 10 or 11 years old. Prior to his incarceration, Smith would drink

a couple of times per month. Smith said that when he drank, he would drink to excess, and that he "blacked out" a couple of times. During a 2- to 2½-year period within the first 5 years of his incarceration, Smith drank alcohol one to two times per week, but he claimed to have quit using alcohol entirely when he was 29 years old.

Smith reported that he first smoked marijuana when he was 9 years old. Smith said that he rarely smoked marijuana before his incarceration, but that after incarceration and prior to getting sober, he would smoke anytime he could obtain marijuana. Smith said he last used marijuana when he was 34 years old.

Smith denied using any drugs or alcohol after he was transferred to Missouri in 2000. Smith's progress reports from Missouri corroborate this; of the 47 urinalysis tests conducted over the course of 15 years, all of Smith's samples were negative for drugs or alcohol. However, there was a problem with one test. When Smith submitted a urine sample on April 16, 2003, the test showed that his urine was diluted, and Smith received a misconduct report for the incident.

#### (iv) Risk for General Violence and Sexual Violence

Dr. Huss determined that, compared to the general community, Smith was at low risk to commit both general violence and sexual violence. As for general violence, Dr. Huss had initially determined that Smith was a "moderate risk," but after reviewing Nollen's statement, Dr. Huss amended his assessment to indicate that Smith was a "low risk."

#### (e) Misconduct Reports

As noted above, Smith argued to the district court that he should be given a lenient sentence because the crimes he committed as a minor do not reflect that he is irredeemably depraved (and thus should spend his life in prison). To support Smith's "'capacity to change,'"[4] he offered his

---

[4] Brief for appellant at 44.

progress reports and misconduct reports from Missouri and Nebraska.

The reports show that Smith had fewer misconduct reports after he entered into his mid-thirties. The decrease in misconduct reports also corresponds with the time that Smith was transferred to Missouri and the time that he became sober. According to Smith, he transferred to Missouri because he realized he needed to change.

### (f) Amici Briefs

To support Smith's arguments about his immaturity, vulnerability, and lack of true depravity at the time of the crime, he offered amici briefs submitted to the U.S. Supreme Court in previous cases. We note that although the State did not object to the offering of the briefs, they provided minimal authority for the trial court.

### (g) Dr. Pope

As further support for Smith's argument that he should be given a lenient sentence, Smith offered into evidence a deposition of Dr. Pope, a director for neurobehavioral research at Boys Town National Research Hospital. Dr. Pope is board certified in child and adolescent psychiatry, as well as adult psychology.

Dr. Pope testified about a landmark study in neuroscience wherein "Nitin Gogtay and Jay Giedd at the National Institute of Mental Health . . . scanned [the brains of] normal developing children . . . between the ages of 5 and 20 [over the course of 15 years]." From the scans, the researchers were able to determine that the brain develops from the bottom to the top and from the back to the front. The study showed that the last part of the brain to develop is the frontal cortex. The frontal cortex allows for higher-order thought processes, like executive functioning, the ability to pay attention to something, the ability to repress impulsivity, and the ability to think through emotional situations. The frontal cortex also helps regulate subcortical areas, like the amygdala.

The amygdala controls a person's reaction to emotions, especially fear.

Dr. Pope explained that because adolescents' prefrontal cortices have not fully developed, they do not have full cognitive regulation of emotional responses, and therefore, "adolescents . . . are easily angered. They misread emotional cues, they act impulsively." Dr. Pope also testified that adolescents tend to undervalue risk and overvalue reward and are unable to appreciate the long-term consequences of their behavior. According to Dr. Pope, the frontal cortex does not fully develop until the mid-twenties.

### 3. District Court's Disposition

During closing arguments, the State argued that Smith should receive a sentence equivalent to or similar in length to that of Smith's codefendant, Nollen, who was resentenced to not less than 90 years nor more than life in prison. The State also suggested that Smith could be sentenced to life imprisonment pursuant to *Miller*.[5] Smith objected to the State's argument and alleged that the State's suggestion that "this is a [*Miller*] case" was a breach of the 1983 plea agreement. Smith also moved to withdraw the 1983 plea agreement. After reviewing the plea agreement, the court overruled the objection and the motion.

Before announcing Smith's sentence, the district court discussed with Smith what it considered to be the relevant facts for purposes of sentencing:

> [Y]ou and . . . Nollen had opportunities to abandon the abduction and sexual assault and ultimate murder of [Mary Jo]. The two of you, as counsel indicated, were simply going to go in and burglarize the place and steal some money. [Mary Jo] was found there. You guys hid downstairs and she was found. Rather than running away out the back door, the two of you decided to abduct her. You then stole her car. I think you actually drove the car

---

[5] *Miller v. Alabama, supra* note 3.

to a gas station here in Blair and you actually went inside and paid, as I recall.

Obviously, I understand the argument that you were under the will of . . . Nollen, but there were opportunities to get away from this thing. You actually went into the gas station and paid for it. You could have gone away or done something different. You didn't do that. . . .

. . . .

The evidence is clear that over a several-hour period you . . . had numerous opportunities to avoid the final decision to take the life of [Mary Jo], and it appears to me that you had a reasonably comparable level of culpability with . . . Nollen in the criminal activities that happened that day, including the final decision to put her body — or to put her in the back of the car and put the car into the Missouri River.

In determining what sentence ought to be imposed upon the defendant, this Court has considered the nature and circumstances of the crime, the history, character, and condition of the defendant, including the defendant's age, mentality, education, experience, social and cultural background, all as back in January of 1983, which was the date of the offense.

The Court has considered the lack of a previous criminal record of the defendant, the motivation for the offense, as well as the nature of the offense and the violence involved in the commission of the offense.

. . . .

. . . [T]he Court recognizes and acknowledges the efforts you have made to improve yourself over the last 32 or 33 years, especially since 2000 when you made a decision to put yourself in a different venue to try and get yourself headed in the right direction, and you have done some good things. I acknowledge that from the [resentencing] hearing and what was — what was added to the presentence investigation report.

The Court can't however . . . overlook the numerous opportunities you had to avoid the ultimate decision, and I do recognize the mitigating qualities of youth and the immaturity and the lack of development to the prefrontal cortex of the brain, the decision-making part, I acknowledge all those things.

However, again, I look at the opportunities you had, the ultimate decision to drown [Mary Jo] in the manner in which it happened, the terror that was inflicted by you and . . . Nollen for several hours leading up to her death, and the manner in which she died has been described several ways today, but it's horrific the way that she died.

After citing the usual sentencing factors, as well as mitigating factors set forth in Neb. Rev. Stat. § 28-105.02 (Reissue 2016), the district court sentenced Smith to 90 years' to life imprisonment. In advising Smith of his parole eligibility, the court was unsure of which good time law would apply—the law at the time Smith committed the crime or the current good time law. If the current good time law applies, Smith will be eligible for parole when he is 62 years old. If the 1983 good time law applies, Smith will be eligible for parole when he is 77 years old.

## III. ASSIGNMENTS OF ERROR

Smith assigns, restated, that the district court erred in overruling his objections and motions related to the State's alleged breach of the plea agreement and that the district court abused its discretion in imposing an excessive sentence. Smith also assigns that the sentence of 90 years' to life imprisonment is a "*de facto* sentence of life imprisonment without parole" in violation of *Graham*,[6] the 8th and 14th Amendments to the U.S. Constitution, and article I, §§ 9 and 15, of the Nebraska Constitution.

---

[6] *Graham v. Florida, supra* note 1.

## IV. STANDARD OF REVIEW

[1] When the facts are undisputed, the question of whether there has been a breach of a plea agreement is a question of law.[7]

[2] Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law.[8] When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.[9]

[3] A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result.[10]

## V. ANALYSIS

### 1. Plea Agreement

[4] We first address Smith's argument that the State breached the plea agreement and that the district court erred in overruling his objection and motions for specific performance or withdrawal of the plea agreement. Smith is correct that when the State breaches a plea agreement, the defendant generally has the option of either having the agreement specifically enforced or withdrawing his or her plea.[11] However, it is clear from the record that the State did not breach any of the terms or conditions in the plea agreement.

[5] Smith claims that the State broke its promise to dismiss the first degree murder charge when it argued that Smith

---

[7] See, *State v. Sidzyik*, 281 Neb. 305, 795 N.W.2d 281 (2011); *State v. Gonzalez-Faguaga*, 266 Neb. 72, 662 N.W.2d 581 (2003).

[8] See *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014).

[9] See, *State v. Sims*, 277 Neb. 192, 761 N.W.2d 527 (2009); *State v. Davis*, 276 Neb. 755, 757 N.W.2d 367 (2008).

[10] *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

[11] *State v. Gonzalez-Faguaga, supra* note 7.

should receive the same sentence as someone convicted of murder, i.e., life imprisonment. However, courts enforce only those terms and conditions about which the parties to a plea agreement did in fact agree,[12] and nothing within the plea agreement restricted the State from recommending a life sentence. In fact, the record shows that at the time the agreement was entered into, the mandatory sentence for Smith's crime of kidnapping, as well as for felony murder, was life imprisonment. So, clearly, the parties contemplated that the State would advocate for Smith to receive life imprisonment. As such, the State did not breach the plea agreement, and the district court did not err in overruling Smith's objections and motions related to that assertion.

## 2. GOOD TIME LAW

As noted above, the district court was unsure of which good time law would apply to Smith's sentence—the current law or the law in effect at Smith's original conviction. In the State's brief and at oral argument, the State addressed issues relating to Smith's sentence on the premise that Smith's parole eligibility would be calculated using current good time law; however, on rebuttal at oral arguments, Smith's counsel advised the court that the Nebraska Department of Correctional Services had changed Smith's parole eligibility date on its website and is now calculating Smith's parole eligibility using the old good time law. If the current law applies, Smith will be eligible for parole when he is 62 years old. If the 1983 good time law applies, Smith will be eligible for parole when he is 77 years old. With both parties arguing the impact that Smith's parole eligibility date has on this case, we shall first determine when Smith will be eligible for parole.

[6-8] We conclude Smith will be eligible for parole on January 11, 2028, when Smith is 62 years old, because the *current* good time law is the correct law to be applied. In

---

[12] See *State v. Landera*, 285 Neb. 243, 253, 826 N.W.2d 570, 577 (2013).

*State v. Schrein*,[13] we held that the good time law to be applied to a defendant's sentences is the law in effect at the time the defendant's convictions become final. We explained that a defendant's convictions and sentences become final on the date that the appellate court enters its mandate concerning the defendant's appeal. Because an action for habeas corpus constitutes a collateral attack on a judgment and only void judgments may be collaterally attacked,[14] the order granting Smith's application for a writ of habeas corpus and vacating his original life sentence voided that original sentence. A void sentence is no sentence.[15] With Smith's original kidnapping sentence being considered as having been no sentence imposed, then, the rule in *Schrein* would apply to Smith's current kidnapping sentence of 90 years' to life imprisonment. This sentence will be final on the date this court enters its mandate concerning this appeal. Therefore, the applicable good time law is the law currently in effect, which means that Smith will be parole eligible at age 62.

## 3. SMITH'S LIFE EXPECTANCY

The parties also contend that Smith's life expectancy is relevant to our constitutional analysis. Evidence of his life expectancy can be found in his presentence report. According to the federal government's Centers for Disease Control and Prevention, a person of Smith's age has an average life expectancy of 78.8 years old.

The presentence report also contains a document entitled "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences" which seems to suggest that the life expectancy of incarcerated youths is significantly reduced compared to that of the general population. This same document was

---

[13] *State v. Schrein*, 247 Neb. 256, 526 N.W.2d 420 (1995).

[14] *Berumen v. Casady*, 245 Neb. 936, 515 N.W.2d 816 (1994).

[15] *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995).

also considered by the Supreme Courts of Iowa and Wyoming. And like those courts, "we do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates."[16]

Although we decline to find that average life expectancy is the sole controlling issue, we acknowledge that it is a matter the court can consider along with all other sentencing factors. Here, the presentence report supports that the average life expectancy for someone Smith's age is 78.8 years, and as discussed above, Smith is eligible for release at 62 years of age.[17] Accordingly, Smith's sentence of 90 years' to life imprisonment allows for parole eligibility almost 17 years before his average life expectancy.

### 4. Constitutionality of Kidnapping Sentence

We next address the assignments of error relating to Smith's kidnapping sentence. Smith claims that his sentence of 90 years' to life imprisonment is excessive and amounts to a de facto life sentence, in violation of *Graham*,[18] the 8th and 14th Amendments to the U.S. Constitution, and article I, §§ 9 and 15, of the Nebraska Constitution. We address Smith's constitutional claim before addressing whether the sentence is excessive.

First, we review the law on juvenile sentencing for non-homicide offenses. In *Graham*, the U.S. Supreme Court reaffirmed that for purposes of sentencing, juvenile offenders are less culpable than adult offenders because (1) juveniles have "a '"lack of maturity and an underdeveloped sense of

---

[16] *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013). Accord *Bear Cloud v. State*, 334 P.3d 132 (Wyo. 2014). See, *Miller v. Alabama, supra* note 3; *Graham v. Florida, supra* note 1.

[17] See Neb. Rev. Stat. § 83-1,110 (Reissue 2014).

[18] *Graham v. Florida, supra* note 1.

responsibility,"'" (2) they "'are more vulnerable or susceptible to negative influences and outside pressures,'" and (3) their characters "are 'not as well formed.'"[19]

[9] Because of these differences, the *Graham* Court held that it is unconstitutional for a state to impose a sentence of life imprisonment without parole on a juvenile convicted of a nonhomicide offense.[20] The Court in *Graham* explained that the Constitution requires that juvenile offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," but left it to the states, "in the first instance, to explore the means and mechanisms for compliance."[21]

We note that the U.S. Supreme Court has not decided the question whether a lengthy term-of-years sentence is, for constitutional purposes, the same as a sentence of life imprisonment without the possibility of parole.[22] However, a number of jurisdictions have concluded that such sentences may trigger the protections afforded under *Graham* and *Miller*.[23] While Smith was not sentenced to life imprisonment without parole, we shall review the sentence to determine whether it comports with the principles set forth in *Graham*.

Although the U.S. Supreme Court provided little guidance as to what constitutes a "meaningful opportunity to obtain

---

[19] *Id.*, 560 U.S. at 68 (quoting *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)).

[20] *Graham v. Florida, supra* note 1.

[21] *Id.*, 560 U.S. at 75.

[22] *U.S. v. Cobler*, 748 F.3d 570 (4th Cir. 2014), *cert. denied* ___ U.S. ___, 135 S. Ct. 229, 190 L. Ed. 2d 173.

[23] See, e.g., *Casiano v. Commissioner of Correction*, 317 Conn. 52, 115 A.3d 1031 (2015), *cert. denied* ___ U.S. ___, 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016); *Brown v. State*, 10 N.E.3d 1 (Ind. 2014); *State v. Null, supra* note 16; *State v. Zuber*, 442 N.J. Super. 611, 126 A.3d 335 (2015), *reversed* 2017 WL 105004 (N.J. Jan. 11, 2017); *Bear Cloud v. State, supra* note 16. See, also, *Miller v. Alabama, supra* note 3; *Graham v. Florida, supra* note 1.

release based on demonstrated maturity and rehabilitation," a number of courts have held that sentences that allow the juvenile offender to be released in his or her late sixties or early seventies satisfy the "meaningful opportunity" requirement.[24] The usual reasoning applied by these courts is that as long as the offender's opportunity for release falls within his or her life expectancy, the offender's sentence does not violate *Graham*.[25] This was the reasoning applied by the Colorado Court of Appeals in holding that a sentence of 76 years' to life imprisonment was not unconstitutional where it allowed for the defendant's release at age 67.[26] It was also the reasoning applied by a Florida court which held that a 50-year sentence that allowed for the defendant's release at age 68 did not violate *Graham*.[27]

As noted by Smith, other courts have interpreted *Graham* to mean that the juvenile offender must be released a certain number of years *before* his life expectancy.[28] For example, in *State v. Null*,[29] the Iowa Supreme Court held that a sentence with a mandatory minimum of 52½ years' imprisonment, which would have allowed the offender to be released at 69 years old, triggered the protections afforded by *Graham*. In reaching this conclusion, the court stated:

> Even if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential

---

[24] *Graham v. Florida, supra* note 1, 560 U.S. at 75. See, *People v. Lehmkuhl*, 369 P.3d 635 (Colo. App. 2013); *Williams v. State*, 197 So. 3d 569 (Fla. App. 2016); *State v. Zuber, supra* note 23. See, also, *Silva v. McDonald*, 891 F. Supp. 2d 1116 (C.D. Cal. 2012); *Thomas v. State*, 78 So. 3d 644 (Fla. App. 2011).

[25] See, *Silva v. McDonald, supra* note 24; *People v. Lehmkuhl, supra* note 24; *Williams v. State, supra* note 24; *Thomas v. State, supra* note 24.

[26] *People v. Lehmkuhl, supra* note 24.

[27] *Williams v. State, supra* note 24.

[28] *Casiano v. Commissioner of Correction, supra* note 23; *State v. Null, supra* note 16; and *Bear Cloud v. State, supra* note 16.

[29] *State v. Null, supra* note 16.

future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller.* The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a "meaningful opportunity" to demonstrate the "maturity and rehabilitation" required to obtain release and reenter society as required by *Graham*.[30]

In *Casiano v. Commissioner of Correction*,[31] the Connecticut Supreme Court held that the principles set forth in *Graham* must be applied to a sentence of 50 years' imprisonment without parole. Quoting *Graham,* the Connecticut Supreme Court reasoned that "a fifty year term and its grim prospects for any future outside of prison effectively provide a juvenile offender with 'no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope.'"[32]

After reviewing other jurisdictions' interpretation of *Graham*, we conclude that there appears to be no consensus as to what constitutes a meaningful opportunity for release. However, because Smith will be parole eligible at age 62, we do not agree that his sentence represents a "geriatric release"[33] or equates to "'no chance for fulfillment outside prison walls,'"[34] because in today's society, it is not unusual for people to work well into their seventies and have a meaningful life well beyond age 62 or even at age 77. Like the court in *State v. Zuber*,[35] we also "do not believe *Graham* mandates that defendants have a 'meaningful life outside of prison' in which to 'engage meaningfully' in a career or raising a

---

[30] *State v. Null, supra* note 16, 836 N.W.2d at 71. See, *Miller v. Alabama, supra* note 3; *Graham v. Florida, supra* note 1.

[31] *Casiano v. Commissioner of Correction, supra* note 23.

[32] *Id.* at 79, 115 A.3d at 1047.

[33] *State v. Null, supra* note 16, 836 N.W.2d at 71.

[34] *Casiano v. Commissioner of Correction, supra* note 23, 317 Conn. at 79, 115 A.3d at 1047.

[35] *State v. Zuber, supra* note 23, 442 N.J. Super at 631, 126 A.3d at 347.

family." Rather, *Graham* requires only a meaningful and real-istic opportunity to obtain release.[36]

Overall, after considering all sentencing factors, we conclude that Smith's kidnapping sentence does not violate the principles set forth in *Graham* and that Smith's assignment of error is without merit.

## 5. Whether Kidnapping Sentence Is Excessive

The only remaining issue is whether the district court abused its discretion in imposing Smith's kidnapping sentence. We find it did not.

[10,11] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[37] Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[38] Because Smith was under the age of 18 when he committed a Class IA felony, § 28-105.02 dictates that the sentencing judge must also consider mitigating factors, such as the defendant's (1) age at the time of the offense, (2) impetuosity, (3) family and community environment, and (4) ability to appreciate risks and consequences of the conduct, as well as (5) the outcome of a comprehensive mental health evaluation of the defendant conducted by an adolescent mental health professional licensed in Nebraska.

---

[36] *Id.*

[37] *State v. Cardeilhac*, 293 Neb. 200, 876 N.W.2d 876 (2016).

[38] *Id.*

The district court considered each of the factors listed above and so stated at the sentencing hearing. The court received considerable evidence as to Smith's life, history, maturity, and susceptibility to peer pressure at the time of the crime. At the sentencing hearing, the judge stated that he understood Smith's argument that he was "under the will of . . . Nollen," and the court "recognize[d] the mitigating qualities of youth and the immaturity and the lack of development to the prefrontal cortex of the brain, the decision-making part." However, in imposing Smith's kidnapping sentence, the court emphasized the horrific nature of the crime and "the numerous opportunities [Smith] had to avoid the ultimate decision [to drown Mary Jo]."

Having reviewed the record and the evidence considered by the court at sentencing, we cannot say that the sentence imposed was an abuse of discretion. Certainly, Smith desires a minimal sentence, but the reality is that even in nonhomicide cases, sometimes the factors set forth by Nebraska law require lengthy terms of incarceration. We conclude that Smith's assignment of error challenging his kidnapping sentence is without merit.

## VI. CONCLUSION

We find Smith's assignments of error to be without merit and affirm his sentence of 90 years' to life imprisonment.

AFFIRMED.